O’Connor, C.J.
{¶ 1} This case has been litigated on three separate occasions and, after each conviction, the Second District Court of Appeals has found reversible error. Most recently, the appellate court concluded that jeopardy had attached and that the guilty verdicts must be reversed. We are compelled to agree.
{¶ 2} For the reasons that follow, we hold that the trial judge erred during the second trial by improperly declaring a mistrial and that the Double Jeopardy Clause bars the retrial of the appellee, Toneisha Gunnell. Accordingly, the judgment of the court of appeals is affirmed to the extent it held that the Double Jeopardy Clause bars retrial.
Relevant Background
{¶ 3} On June 7, 2005, Toneisha Gunnell, Mahogany Patterson, Alicia McAlmont, and Renada Manns drove to the Upper Valley Mall in Springfield, Ohio, to steal clothing. Chris Clarkson, a loss-prevention agent employed by Macy’s department store, watched as Gunnell, McAlmont, and Patterson grabbed clothing from the racks and ran from the store to a waiting car driven by Manns. Although Clarkson chased them, Manns accelerated rapidly as they got into the car.
{¶ 4} John Deselem, a customer who witnessed the incident, stood in the lane of travel as the car sped toward him, waving his arms in an effort to stop the oncoming vehicle. It struck him without slowing down. The force of the impact sent him into the windshield and threw him over the car and onto the ground. He died at the scene from blunt-force injuries to his head. Although the impact had cracked the windshield, Manns drove out of the mall parking lot.
*443 {¶ 5} The Clark County Sheriffs Department located the car abandoned in a ditch a short distance from the mall, recovered the stolen clothing, and began efforts to apprehend the women. The next day, Gunnell, Patterson, McAlmont, and Manns turned themselves in to Columbus police.
{¶ 6} A Clark County grand jury indicted them on counts of murder, aggravated robbery, involuntary manslaughter, and theft, and, following a joint trial, a jury found each of them guilty of all charges.
{¶ 7} After the codefendants were indicted for murder, aggravated robbery, involuntary manslaughter, and theft, their initial convictions were reversed due to a Batson violation. State v. Manns, 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657 (2d Dist.); State v. McAlmont, 2d Dist. No. 2005 CA 130, 2006-Ohio-6838, 2006 WL 3759835; State v. Patterson, 2d Dist. No. 05CA0128, 2007-Ohio-29, 2007 WL 29391; State v. Gunnell, 2d Dist. No. 2005 CA 119, 2007-Ohio-2353, 2007 WL 1429683.
{¶ 8} On retrial, the case was submitted to the jury on October 1, 2007. During deliberations later that night, the jury asked the court to define the word “perverse” as it had been used in the jury instruction relating to the recklessness element of the aggravated-robbery charge. The court did not respond to the jury’s request. The jury eventually retired at 12:22 in the morning of October 2, 2007. Later that morning, when Juror No. 6 returned to court, she brought two pieces of paper, which were intercepted by the bailiff and shared with the court.
{¶ 9} The first piece of paper contained the following handwritten definition of the word “perverse”: “contrary to the manner or direction of the judge on a point of law <perverse verdict>.”
{¶ 10} The second piece of paper was a printout, which read:
Manslaughter: Involuntary
Involuntary manslaughter usually refers to an unintentional killing that results from recklessness or criminal negligence, or from an unlawful act that is a misdemeanor or low-level felony (such as DUI). The usual distinction from voluntary manslaughter is that involuntary manslaughter (sometimes called “criminally negligent homicide”) is a crime in which the victim’s death is unintended.
For example, Dan comes home to find his wife in bed with Victor. Distraught, Dan heads to a local bar to drown his sorrows. After having five drinks, Dan jumps into his car and drives down the street at twice the posted speed limit, accidentally hitting and killing a pedestrian.
*444 (Underlining sic.)
{¶ 11} In response to the juror’s possession of this information, the trial judge held a hearing, which began at 10:41 on the morning of October 2, 2007. At the start of the hearing, the parties were informed of the issue that had developed with Juror No. 6 and her outside research. The parties agreed that Crim.R. 24 prevented the court from seating an alternate juror because the jury had commenced deliberations. Subsequently, Juror No. 6 was brought before the court and parties, and the following exchange took place:
THE COURT: It’s come to our attention that you brought some items in with you this morning. One appears to be a handwritten definition of the term “perverse,” and another one appears to be something that maybe you printed off of the internet that—
JUROR NO. 6: Yes, I did.
THE COURT: A definition or instruction on “involuntary manslaughter.” That’s — these are things you brought in with you today?
JUROR NO. 6: That nobody saw them.
THE COURT: You’re the only one that saw them?
JUROR NO. 6: I told her that I didn’t know we weren’t allowed. I’m sorry.
THE COURT: Okay. Did you—
JUROR NO. 6: And I didn’t talk about it.
THE COURT: All right. Apparently you were doing some research last night or this morning on the internet or—
JUROR NO. 6: I just wanted to see — everybody kept asking what the word “perverse” was, and I just wanted to look it up for myself to see exactly what it meant.
THE COURT: Sure. Okay. What about the — what about the manslaughter issue? Was there something you were doing on the computer with respect to that?
JUROR NO. 6: No. It was just something I wanted — that was for me. I wasn’t going to show them that. I had the other — I had the definition. That was all that I was going to share.
THE COURT: Was there — was there something inadequate or something wrong with the Court’s instruction for “involuntary manslaughter” that you felt like you needed to supplement the instruction or what — was there something that wasn’t clear about the Court’s instruction on that?
*445 JUROR NO. 6: No. I was — I was at home. I was on the computer, and I just — I did not get much sleep last night, and I just — that was mainly for myself. I just wanted to have it clear in my own head.
THE COURT: Okay. Okay. Counsel have any questions for this particular juror?
MR. SCHUMAKER: None from the State, Your Honor.
MR. REED: No, Your Honor. Thank you.
MR. KAVANAGH: No, Your Honor.
MS. CUSHMAN: No.
MR. GRIFFIN: No, Your Honor.
THE COURT: All right. Thank you, [Juror No. 6].
(Emphasis added.)
{¶ 12} The juror was excused and returned to the jury room, and then counsel shared their recpmmendations as to the proper remedy with the court.
{¶ 13} After initially suggesting a preference for a mistrial, the state asserted that Juror No. 6 “would have to be strongly instructed and be able to assure us that she would not use that and particularly that example.” Counsel for all defendants agreed that a curative instruction would be an appropriate response. After listening to these recommendations and the apparent agreement of defense counsel that inquiring of the jury and giving a rehabilitative instruction would be a reasonable remedy, the court nevertheless stated:
So I guess my point is: We can bring her in, and we can all ask her and try to rehabilitate her; and I’m sure she’s going to say all the right things because, again, I think she’s a nice person. And she’s going to want to try to be accommodating and pleasing, and I know or I’m certain she doesn’t want to be responsible for a mistrial.
So she’s going to try to appease us and say what she needs to say; but, you know, I just — I feel like that may be an exercise of futility. I don’t know that I can be convinced that she’s going to be able to put this out of her mind.
(Emphasis added.)
{¶ 14} The court recessed for a short break at 11:08 A.M. So, within the span of a hearing that lasted less than one half hour, the trial judge in this case (1) informed the parties about Juror No. 6’s research into critical legal terms, (2) discussed with counsel the possibility of seating an alternate juror, ultimately *446 rejecting that solution after all parties agreed that Crim.R. 24 prevented that solution, (3) brought Juror No. 6 into the courtroom to inquire generally about what information she had found and why she had looked for it, but without asking her a single question about the prejudice or bias, if any, created by the improper information or about her ability to disregard it, (4) returned Juror No. 6 to the jury room, and (5) asked counsel for their opinions as to how to proceed, with defense counsel unanimously recommending a curative instruction.
{¶ 15} When the hearing resumed at 11:30, the state, having heard the judge, promptly moved for a mistrial. Over defense counsel’s unanimous opposition and renewed argument for a curative instruction, and without examining the juror about the degree of her prejudice, if any, the trial judge declared that the juror had been “irreparably tainted” and that there was “no other option than to sustain the State’s motion. ” (Emphasis added.)
{¶ 16} A second short recess was taken at 11:41 A.M. The proceedings resumed at 11:45, and the court informed the jury that a mistrial had been declared.
{¶ 17} While addressing the jury, the judge stated, “It’s simply that a juror was exposed to some bad information; and it’s very difficult, if not impossible, to block that out.” When the judge finished his explanation, some of the jurors had questions. The following exchange occurred:
JUROR NO. 9: So why couldn’t you have just told us [that the definition of involuntary manslaughter brought in by Juror No. 6 was wrong], and we could have gone on?
THE COURT: Well—
JUROR NO. 9: In Ohio that wasn’t the way it was.
THE COURT: Well, that’s a good question. Well, first of all, 11 of you didn’t know about it.
JUROR NO. 9: True.
THE COURT: So but the one person that had been exposed to information that getting drunk and going twice the speed limit equals manslaughter.
JUROR NO. 9: So you couldn’t just have told her then?
THE COURT: Well, what do you think — I mean, what do you think that would have done?
JUROR NO. 9: I think she would have realized that that wasn’t right. I mean, I would have said, “Oh, okay. That’s not Ohio law.”
THE COURT: Well, my question back to that juror would be, then, why are you looking at—
*447 JUROR NO. 9: I would question on that too, yeah.-
THE COURT: Why are you looking at something other than what the Court gave you?
{¶ 18} Following the mistrial, Gunnell, Patterson, McAlmont, and Manns moved to preclude retrial on double jeopardy grounds, asserting that there had been no manifest necessity for a mistrial. The trial court denied that motion and scheduled the ease for retrial.
{¶ 19} The codefendants petitioned the federal court for writs of habeas corpus seeking to bar retrial on double jeopardy grounds. The district court dismissed their petitions, concluding that the trial court’s declaration of a mistrial “was not an unreasonable application of clearly established law as declared by the United States Supreme Court.” Gunnell v. Rastatter, S.D. Ohio No. 3:08-CV-064, at 13 (Sept. 17, 2008). Only Manns appealed to the Sixth Circuit Court of Appeals, which affirmed.[1] Gunnell v. Rastatter, 6th Cir. No. 08-4505 (Jan. 26, 2010).
{¶ 20} The state proceeded to retry Gunnell, McAlmont, and Patterson, and a third jury returned verdicts finding them all guilty of all charges. They separately appealed, and the court of appeals again reversed their convictions. In Patterson’s and Gunnell’s cases, the court held that the trial court should have declared a mistrial because a statement of a state’s witness from a previous trial, which had not been admitted into evidence, had inadvertently been submitted to the jury. State v. Patterson, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439, ¶ 80 (2d Dist.); State v. Gunnell, 2d Dist. No. 09-CA-0013, 2010-Ohio-4415, 2010 WL 3620256, ¶ 51. And in Gunnell’s and McAlmont’s cases, the court held that double jeopardy barred retrial because there had not been a manifest necessity for the mistrial declared at the second trial.[2] Gunnell at ¶ 194; State v. McAlmont, 2d Dist. No. 09-CA-21, 2010-Ohio-5879, 2010 WL 4924770, ¶2-3.
{¶ 21} We accepted the state’s discretionary appeal in Gunnell’s case to review whether the Double Jeopardy Clause barred her retrial. 127 Ohio St.3d 1531, 2011-Ohio-376, 940 N.E.2d 985. We subsequently accepted the state’s appeal in McAlmont’s ease and held it for the decision here. 128 Ohio St.3d 1444, 2011-Ohio-1618, 944 N.E.2d 694.
{¶ 22} The state maintains that the court of appeals improperly substituted its judgment for that of the trial court on the manifest-necessity question. It contends that the trial court acted reasonably in declaring a mistrial because *448 Juror No. 6 had violated instructions not to research the law and the court doubted her ability to obey a curative instruction. It also contends that when a juror obtains extrajudicial information contrary to the state’s case through misconduct, the situation is presumptively prejudicial, and the burden shifts to the defendant to establish that the juror was not prejudiced by the outside research.
{¶ 23} Gunnell responds that the appellate court required only that the trial court make a reasonable inquiry of the juror and further emphasizes that the state failed to meet its heavy burden of demonstrating manifest necessity for a mistrial. Gunnell also asserts that even when the prosecution moves for a mistrial based on juror misconduct, it still bears the burden to demonstrate manifest necessity for the mistrial to avoid the double jeopardy bar to a retrial.
{¶ 24} Thus, the key issue in this case is whether the trial court acted unreasonably in addressing juror misconduct and in determining that a manifest necessity existed for a mistrial. If so, double jeopardy is implicated and bars retrial.
Analysis

Governing Principles

{¶ 25} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution ensures that a state may not put a defendant in jeopardy twice for the same offense. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). It also “affords a criminal defendant a Valued right to have his trial completed by a particular tribunal.’ ” Oregon v. Kennedy, 456 U.S. 667, 671-672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), quoting Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). However, this
valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate “manifest necessity” for any mistrial declared over the objection of the defendant.
(Footnote omitted.) Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).
*449 {¶ 26} What constitutes a “manifest necessity” is left to the discretion of the courts, which must “exercise a sound discretion on the subject [as] it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes * * *.” United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).
{¶ 27} The Supreme Court cautions that the manifest-necessity standard “abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial.” Illinois v. Somerville, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). In Washington, the court acknowledged that there is a wide range of possible justifications for declaring a mistrial and that the question of whether a manifest necessity exists is more easily answered in some cases than in others. “At one extreme end of the spectrum are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. * * * The prohibition against double jeopardy as it has evolved in this country was plainly intended to condemn this ‘abhorrent’ practice.” Id. at 507-508, quoting State v. Garrigues, 2 N.C. 188, 189 (1795). At the opposite end of the spectrum, a court’s decision to declare a mistrial due to a hung jury is fairly easily viewed as justified and should be afforded a high degree of deference. Washington at 509.

Application

{¶ 28} Although trial judges are entitled to wide latitude when considering motions for mistrial, their discretion is not unbridled. As the Sixth Circuit Court of Appeals recently observed in Ross v. Petro, 515 F.3d 653 (6th Cir.2008), “[w]hen a mistrial is premised on the prejudicial impact of improper evidence or argument, the trial judge’s evaluation of the possibility of juror bias is entitled to ‘great deference.’ ” (Emphasis sic.) Id. at 661, quoting Washington, 434 U.S. at 514, 98 S.Ct. 824, 54 L.Ed.2d 717. Thus, when a mistrial is predicated on juror misconduct, the trial court finding of manifest necessity will be upheld unless “instead of exercising sound discretion, [the trial judge] acted ‘irrationally or irresponsibly.’ ” Ross at 669, quoting Washington at 514.
{¶ 29} But significantly, Ross expressly states that “[notwithstanding this deference, the reviewing court must be satisfied that the trial judge did not act irrationally or irresponsibly, but exercised ‘sound discretion.’ ” (Emphasis added.) Ross at 661, quoting Washington at 514. Thus, Ross does not vitiate meaningful appellate review of mistrials. To the contrary, it supports the holding *450 that a trial judge’s determination of possible juror bias should be given great deference only upon the appellate court’s satisfaction that the trial judge exercised sound discretion in determining whether juror bias existed and whether it could be cured. Ross does not hold, or even suggest, that the mere specter of bias is a manifest necessity that warrants mistrial.
{¶ 30} In fact, quite the opposite is true. The Supreme Court clearly teaches that hearings on the issue of a juror’s impartiality “will frequently turn upon testimony of the juror in question” and that it is error to contend that such evidence “is inherently suspect.” Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), fn. 7. “ ‘One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.’ ” Id., quoting Dennis v. United States, 339 U.S. 162,171, 70 S.Ct. 519, 94 L.Ed. 734 (1950).
{¶ 31} Thus, understood in full context, although a trial judge’s determination of juror bias is entitled to great deference, it must be predicated on the judge’s proper discretion in hearing the case. Mere supposition, surmise, and possibility of prejudice are not sufficient. This distinction is a simple but critical one, and one that was overlooked by the trial judge in this case. Although a trial judge’s determination of juror bias sufficient to create the need to declare a mistrial is a matter of discretion, the record here reveals nothing of substance from which the judge made his determination.
{¶ 32} The inquiry of Juror No. 6 was limited and ineffective. The questions did not unearth what bias, if any, the juror absorbed as a result of reading the forbidden material. See State v. Durr, 58 Ohio St.3d 86, 91, 568 N.E.2d 674 (1991). And it certainly did not establish whether that bias, if any, could be cured by further instruction from the court. “Unless an appellant demonstrates otherwise, we should assume that the members of the jury followed their oaths and deliberated only upon the evidence adduced at trial.” Id., citing State v. Zuem, 32 Ohio St.3d 56, 60, 512 N.E.2d 585 (1987).
{¶ 33} We, of course, have no way of appraising Juror No. 6’s credibility. But nothing in the record establishes that she was so “nice” that she would deny whatever bias she might have incurred in order to be “accommodating and pleasing,” thereby violating her oath as a juror. The transcript reveals that she was confused about terms for which the trial judge had refused to provide instruction and took it upon herself to educate herself about the terms — in violation of an unequivocal instruction to not do so. The limited information before us also suggests that she understood that it was wrong to do so and that she had not tainted the jury with the information. Although all agree that it was error for her to conduct outside research, it was also error for the judge to make *451 no more than a limited inquiry of the juror — an inquiry that merely established the misconduct, not any prejudice from it. The judge disregarded the constitutional commands that the court, in deciding whether a manifest necessity exists to declare a mistrial, must act “rationally, responsibly, and deliberately.” We cannot conclude that the trial court acted with deliberateness in this case.
{¶ 34} The trial judge expressed openly to counsel his supposition that Juror No. 6 would “say all the right things” and “try to appease us and say what she needs to say” because she was “nice.” His comments suggested that he had simply concluded, based on some generalized sense of the juror’s pleasant demeanor, that bringing her back for an attempt to explore the scope of any prejudice and to cure her misconduct “may be an exercise of futility” because “I don’t know that I can be convinced that she’s going to be able to put this out of her mind.” No wonder that after a short recess, the judge was met with the state’s motion for a mistrial. With little reflection upon hearing the motion, the judge declared that Juror No. 6 was “irreparably tainted” and granted the motion.
{¶ 35} The rapidity with which the events unfolded is not dispositive, of course. But it suggests haste in reaching a conclusion rather than a conclusion made in “the greatest caution.” Perez, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165.
{¶ 36} Far more troubling, though, is the fact that the record is devoid of any showing that the state shouldered its heavy burden of justifying the mistrial by showing a manifest necessity. Washington, 434 U.S. at 505, 98 S.Ct. 824, 54 L.Ed.2d 717. In essence, the trial judge invited the state to move for mistrial based on his apparent conclusion that there was insurmountable juror bias. And he did so without inquiry of the juror about that bias, in the face of agreement of all defense counsel that inquiry of the juror and a strong curative instruction might suffice and despite our clear precedent that when a trial court learns of possible improprieties that might affect the impartiality of a juror, the court has a duty to hold a hearing to determine whether any bias has been introduced into the jury room. See State v. Phillips, 74 Ohio St.3d 72, 88-89, 656 N.E.2d 643 (1995) (court has duty to hold hearing on possible juror bias resulting from improper outside communication).
{¶ 37} Had the judge actually inquired into the salient issue of prejudice with the juror, he may well have acted within his discretion. But we cannot condone the notion that a judge acts rationally, reasonably, or deliberately in declaring a mistrial, on retrial, in a difficult criminal case without any meaningful inquiry into the issue of juror bias. It is neither lawful nor conscionable to predicate a mistrial on speculation alone.
*452 {¶ 38} A mistrial declared upon the judge’s mere speculation of prejudice is not an act of “the greatest caution.” Perez, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165. It is a travesty. And that is exactly what is before us.
{¶ 39} The court of appeals was correct in holding that the mistrial was in error and that the Constitution demands reversal of these convictions.
Conclusion
{¶ 40} The decision to declare a mistrial based on juror misconduct is a matter within the sound discretion of the trial court and is entitled to great, but not unlimited, deference by a reviewing court. In this case, the trial court did not soundly exercise that discretion by inquiring of the juror to ascertain the scope of the prejudice, if any, to the appellee before determining that the juror could not be rehabilitated and that a mistrial was necessary. Because the record here cannot establish that a manifest necessity existed to declare a mistrial, double jeopardy attaches, and the Constitution commands that no further prosecution of the appellee may occur. Accordingly, the judgment of the court of appeals is affirmed to the extent that it held that the Double Jeopardy Clause barred retrial.
Judgment affirmed.
Pfeifer, Lanzinger, and McGee Brown, JJ., concur.
Lundberg Stratton, O’Donnell, and Cupp, JJ., dissent.

. Manns subsequently resolved her case by way of a plea agreement with the state.

. After the state appealed to this court, Patterson negotiated a plea agreement, and the state dismissed that appeal.