[Cite as *State v. Zaragoza*, 2016-Ohio-144.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26706 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-493 |
| | : | |
| SAUL A. ZARAGOZA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of January, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. No. 0067020, NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 130 West Second Street, Suite 2150, P.O. Box 10126, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-appellant, Saul A. Zaragoza, appeals from the decision of the Montgomery County Court of Common Pleas overruling his motion to dismiss the charges levied against him. Specifically, Zaragoza contends that after two mistrials, a third trial would violate his constitutional right against double jeopardy. He also claims that the trial court abused its discretion in replacing a juror during his second trial, and that it improperly interviewed the dismissed juror outside the presence of counsel. Zaragoza further claims that the trial court and its bailiff had improper ex parte communications with other jurors. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

**{¶ 2}** On February 14, 2014, the Montgomery County Grand Jury returned a two-count indictment against Zaragoza charging him with possession of marijuana in an amount equal to or exceeding 40,000 grams and trafficking in marijuana in amount equal to or exceeding 40,000 grams. Zaragoza pled not guilty to the charges and on December 15, 2014, the matter proceeded to a jury trial. Zaragoza participated at trial through a Spanish-speaking interpreter. On the third day of trial, a mistrial was declared after it was discovered that the translation of the proceedings was deficient, as the interpreter was only summarizing the proceedings and not fully interpreting the testimony.

**{¶ 3}** Following the mistrial, Zaragoza's case went to trial again on March 2, 2015, and the jury began deliberating on Friday, March 6, 2015. Before excusing the jury to deliberate, the trial court instructed the alternate jurors that they were free to leave, but

that they were not allowed to discuss the case with anyone until the jury entered its verdict. Thereafter, deliberations were postponed early on Friday and scheduled to continue the following Monday because Juror No. 3 had become agitated, claiming he had to leave immediately for an appointment.

{¶ 4} On the following Monday morning, the trial court had a recorded meeting in chambers with counsel for both parties, the jury foreperson, and the bailiff. At the meeting, the trial court advised counsel that the bailiff had informed the court that after the jury was dismissed on Friday, the bailiff observed four jurors crying, including the foreperson, who reported that Juror No. 3 had been verbally abusive toward the other jurors. The trial court also advised counsel that after receiving that information, it had telephoned the foreperson to further inquire about the situation with Juror No. 3. The trial court further noted that it had discussed the matter with the foreperson earlier that morning, and that the bailiff had telephoned the first alternate juror to determine whether she had abided by the court's admonitions and, if so, to have her return to court in the event a replacement juror would be needed.

{¶ 5} After apprising counsel of the foregoing information, the trial court had the foreperson and bailiff explain the situation with Juror No. 3 on the record. The foreperson advised that Juror No. 3 was angry during Friday's deliberations because he felt he could not voice his opinion. Specifically, the foreperson stated that Juror No. 3 turned to her and said "he had heard enough of you young people and it was his turn to speak." Trial Trans. Vol. III (Mar. 9, 2015), p. 650. According to the foreperson, even after Juror No. 3 expressed his opinions, he grew angrier throughout the day. The foreperson further indicated that Juror No. 3 did not express his opinions like the other

jurors, but rather, pointed at everyone, called them all idiots, and had a "boiling" temper. *Id.* at 651. Nevertheless, the foreperson assured the trial court that Juror No. 3's behavior did not stem from the deliberations, but rather it was his attitude towards the other jurors.

{¶ 6} Continuing, the foreperson indicated that the other jurors were nervous due to Juror No. 3's behavior, and noted that Juror No. 3 had attempted to leave the jury room during deliberations. In addition, the foreperson indicated that she and the other jurors felt like Juror No. 3's behavior could escalate into something worse and that she was afraid Juror No. 3 could become physical. While the foreperson claimed that she would be able to continue deliberating with Juror No. 3, she did not know if the other jurors would be able to because they were so uncomfortable with him.

{¶ 7} After the foreperson left chambers, the trial court noted on the record that the foreperson had been more forthright about Juror No. 3's attitudes when she spoke to the court earlier, and that the foreperson had minimized the situation that was originally relayed to the court. The trial court further noted that Juror No. 3 was, at the moment, being very loud outside chambers. The trial court was later advised by a clerk that Juror No. 3 was upset because he wanted to know what was going on inside chambers.

{¶ 8} Next, the trial court had the bailiff discuss her observations on the record. The bailiff said that one of the younger female jurors reported that she had "never, ever been talked to the way I've been talked to by [Juror No. 3]." Trial Trans. Vol. III (Mar. 9, 2015), p. 657. The bailiff also overheard another female juror tell Juror No. 3 that she did "not appreciate being called an idiot." *Id.* Continuing, the bailiff claimed that another one of the younger female jurors reported that she was so upset by Juror No. 3 that she

cried all the way home, did not eat, and did not want to come back for deliberations because she was nervous and a little scared of him. The bailiff also indicated that yet another juror reported that Juror No. 3 seemed to have issues with women and that he did not want to listen to anything that the female jurors had to say.

{¶ 9} Following the bailiff's statements, the trial court advised that before determining whether to remove Juror No. 3 from the jury, the court wanted to interview Juror No. 3 on the record without counsel present. The trial court explained that it did not want counsel present during the interview because it did not want counsel to know where the jury was in its deliberations, as the court was concerned that it might not be able to contain Juror No. 3's comments. Zaragoza's trial counsel objected to the court interviewing Juror No. 3 without counsel and to Juror No. 3's potential removal from the jury. The trial court, however, proceeded with the private interview of Juror No. 3 over Zaragoza's objection.

{¶ 10} During the interview, the trial court asked Juror No. 3 about the complaints regarding his behavior and the following discussion ensued:

Court: When people left Friday, I had some complaints about your behavior, so I wanted to talk to you about that. It's my understanding that you were pointing fingers at people, calling them stupid, saying you weren't going to listen to them, getting up at the end and just insisting you had to leave. What was going on Friday with you? Was there anything?

Juror No. 3: Yeah, yeah. I remember. No. It was just a matter of them, what everyone call them, misses, girls, whatever. They don't

have any respect for me at all, so any time you verbally put in your opinion on anything, it's suddenly a staccato of rebellion or rebuke. And I just got to the point where I was tired of getting yelled at and, you know, treated like a red-headed stepchild. You know what I'm saying?

Court: Was it just the women or the misses as you call them?

Juror No. 3: Right. The fellows—I get along fine with the fellows. I developed a really nice relationship with Matt before he left to help. He was a nice fellow and he was a nice guy to talk with and stuff. But those women in there—all they want to talk about is their husbands, or their family, or this, or that, and the other and they keep up this staccato all day long. Now, you know, we haven't gotten into the format yet. We're actually trying to come up with a verdict here yet. Okay? Still, all this stupid small talk, but on Friday, I guess that I just came to a hill maybe. Maybe I should have been on one of my medicines or something like that so that I would have just more or less ignored the situation and verbally not said anything, just be passive. But I didn't feel that way. I felt ill-tempered and I felt like they're just screwing with you. They really—you get the feeling like they really don't want you on that jury because you're different from them. Okay? And so they—ad (sic) you're older. I'm a senior citizen. I'm 66

years old. I just feel that there was this animosity towards me no matter what I said on the case to either defend the Defendant or listen to what they had to say about giving him a guilty verdict.

Court: Okay. I don't want to hear about the specifics of where your deliberations are. Okay? Just what do you mean that maybe you should have taken your medication? Are you on medication?

Juror No. 3: Uh-huh.

Court: What kind of medication are you on?

Juror No. 3: Lithium carbonate.

Court: Okay. And you have –

Juror No. 3: I'm a veteran.

* * *

Court: And you haven't—you're not taking it right now?

Juror No. 3: No. I took my dosage this morning. And I've got to take more dosage later on in the day, later in the p.m.

Court: What's the lithium for?

Juror No. 3: More or less to keep your temper uneven and not fall into depression.

Court: Okay. Okay.

* * *

Juror No. 3: I have a problem with that—

Court:　　　Okay.

Juror No. 3:　—at times falling into depression.

Court:　　　Yeah.　You mentioned, like you talked about, the women or the misses.

Juror No. 3:　I didn't say much at all really.　I just was defending myself.

Court:　　　And why did you feel you had to defend yourself?

Juror No. 3:　Well, when all that was coming at me from all them, every girl or woman, whatever, in there, you know—I wasn't seeking friendships.　I didn't talk to anyone except for the fellows. But for the most part, I'm a fellow that keeps his mouth shut and just listens in this situation because I know it's a hot spot for me.　And [I] just feel like they're trying to get me in touch with the court and everything else, get me in trouble, you know.　So you know, as far as my life out here, I've got a sweetheart.　I don't need to come in here and look for a sweetheart.　So I don't know if they started feeling offended like that, because I started talking and bringing up points there, or if it's just the simple fact they don't like you, they don't like the way you look, they don't like you because you're an older fellow.　I haven't told them anything about myself at all. But they don't ask.　They just simply ignore you, just like before [the bailiff] came down and got me, you know.　I just lay back, and get some rest, and close my eyes until we have

Court:      to really do something. And then, you know, I'll try to participate, but—

Court:      Do you feel like the women are all against you?

Juror No. 3:  Yes, absolutely.

Court:      Okay.

Juror No. 3:  They certainly aren't attracted to me, either, so they've got personalities to match.

Court:      Okay. So—

Juror No. 3:  I mean, they're bloodthirsty, too. I don't care for that in women, you know.

Trans. Vol. III (Mar. 9, 2015) p. 662-666.

{¶ 11} Following this discussion, the trial court dismissed Juror No. 3, concluding that he was unstable, disruptive of deliberations, and a safety threat to the female jurors. *See* Decision, Order and Entry Overruling Defendant's Motion to Dismiss (May 21, 2015), p. 3. However, before replacing Juror No. 3, the court interviewed the first alternate juror on the record with counsel present. The trial court asked the alternate juror whether she had discussed the case with anyone, to which the alternate juror replied: "No." *Id.* at 676. The court also asked if the alternate juror could be a juror based upon the evidence heard at trial and nothing else, to which the alternate juror responded: "Yes." *Id.* Thereafter, the trial court advised that the first alternate juror would replace Juror No. 3 and noted Zaragoza's continuing objection.

{¶ 12} After informing the jury that Juror No. 3 had been replaced by the alternate juror, the trial court instructed the jury that they must restart their deliberations from the

beginning. The court also advised that the jury instructions were the same as before, but the juror's notes from the previous deliberations would not be returned and that they would receive new copies of the jury instructions so that they could start anew. The jury then recommenced its deliberations.

{¶ 13} Later that day, the trial court received a note from the jury indicating that it could not reach a unanimous verdict. Upon receiving the note, the trial court asked the jury if, given more time, there was a possibility an agreement could be reached. However, after discussing whether it was possible for them to ever reach a verdict, the jury concluded that it could not. As a result of the jury deadlock, the trial court declared another mistrial.

{¶ 14} Following the second mistrial, Zaragoza filed a motion to dismiss the charges against him based on the Double Jeopardy Clause of the United States Constitution. In his motion, Zaragoza alleged that the trial court improperly dismissed Juror No. 3, erred in interviewing Juror No. 3 without counsel being present, and had improper ex parte communications with certain jurors. According to Zaragoza, the "unique hung jury situation" in this case resulted in jeopardy attaching and prevented him from being retried a third time. On May 21, 2015, the trial court issued a written decision overruling the motion to dismiss.

{¶ 15} Zaragoza now appeals from the trial court's decision overruling his motion to dismiss, raising three assignments of error for review.

**First Assignment of Error**

{¶ 16} Zaragoza's First Assignment of Error is as follows:

THE TRIAL COURT IMPROPERLY DISMISSED THE JUROR ABSENT EVIDENCE THAT HE WAS UNABLE TO PERFORM HIS DUTIES AS A JUROR.

{¶ 17} Under his First Assignment of Error, Zaragoza contends that the trial court abused its discretion when it dismissed Juror No. 3 from the jury. Specifically, Zaragoza contends that the trial court was only permitted to remove Juror No. 3 if the court found that Juror No. 3 was unable to perform his duties, which Zaragoza claims was not reflected in the record. Rather, Zaragoza claims that the record establishes that deliberations could have continued with Juror No. 3 on the jury panel, and that the trial court's decision to replace Juror No. 3 prejudiced him. We disagree.

{¶ 18} "Crim.R. 24(G) and R.C. 2945.29 address removal of jurors during criminal trials." *State v. Cunningham*, 2d Dist. Clark No. 10-CA-57, 2012-Ohio-2794, ¶ 45. R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty[.]" Crim.R. 24(G)(1) similarly provides that alternate jurors "shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Moreover, "[a]s of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after deliberations have begun." *State v. Hunt*, 10th Dist. Franklin No. 12AP-103, 2013-Ohio-5326, ¶ 71. "However, '[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.' " *Id.*, quoting Crim.R. 24(G)(1).

{¶ 19} "A trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the

trial judge that the juror's ability to perform his duty is impaired.' " *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 46, quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198, 500 N.E.2d 323 (11th Dist.1985). (Other citations omitted.) "Absent a record showing that the court abused that discretion which resulted in prejudice to the defense, the regularity of the proceedings is presumed." *Id.*, citing *Beach v. Sweeney*, 167 Ohio St. 477, 150 N.E.2d 42 (1958). (Other citation omitted.)

{¶ 20} "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 21} In *State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008-Ohio-2041, the Eighth Appellate District held that a trial court did not abuse its discretion in replacing a juror with an alternate where the original juror was observed laughing inappropriately, exhibiting odd behaviors, and was not forthcoming as to her true address. *Id. at* ¶ 66. Other jurisdictions have found the removal of a juror permissible when the juror threatens or intimidates other jurors and disrupts deliberations. *Shotikare v. United States*, 779 A.2d 335, 340 (D.C.2001). For instance, in *State v. Arnold*, 280 Ga. 487, 629 S.E.2d 807 (2006), it was held that a trial court did not abuse its discretion in removing a juror who cursed at other jurors and actively humiliated them through the use of vindictive personal

attacks such as calling them "stupid" and "monkeys". *Id.* at 490. Nevertheless, a juror cannot be removed if there is " 'any possibility' that fellow jurors' complaints about him or her are rooted in his or her view of the merits of the case." *State v. Robb*, 88 Ohio St.3d 59, 81, 723 N.E.2d 1019 (2000), quoting *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir.1997).

{¶ 22} In this case, after interviewing the jury foreperson, the bailiff, and Juror No. 3, the trial court noted that it believed the female jurors were afraid of Juror No. 3 and that Juror No. 3 had admitted to having a problem with the female members of the jury. The court advised that Juror No. 3 believed the female jurors did not respect or listen to him. The court also noted that Juror No. 3 admitted to being off his medication and "out of sorts" while interacting with the jurors during Friday's deliberations. The court further explained that "[t]here's just something wrong with him" and that he had a "continued antipathy towards women just because they're women—and there are nine of them on this jury[.]" Trial Trans. Vol. III (Mar. 9, 2015), p. 668. The trial court also stated:

> I believe my duty is to have a jury that can deliberate. There was something really off about him. And that in—which we probably would know—I'm sure there are plenty of juries with people who have something off about them, but in this case, you know, he had four of the jurors crying on their way out on Friday because of his actions towards them. He did sort of admit he was a little more combative on Friday * * *.

*Id.* In its written decision overruling Zaragoza's motion to dismiss, the trial court concluded that Juror No. 3 was unstable, disruptive to the deliberations, and a safety threat to the female jurors.

{¶ 23} Upon reviewing the record, we do not find that the trial court abused its discretion in dismissing Juror No. 3 from the jury. In reaching this decision, we note that the trial court had the opportunity to observe Juror No. 3 first-hand and was, therefore, in the best position to judge his demeanor. *See State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42. The trial court's belief that Juror No. 3 was unstable, disruptive to deliberations, and a safety threat to the female jurors was reasonable in light of the comments made by Juror No. 3, the jury foreperson, and the bailiff. The record establishes that Juror No. 3 disrupted deliberations by attempting to leave the jury room. In addition, it is clear from the record that Juror No. 3 has a negative attitude toward women in general and a strong dislike for the female members of the jury. Juror No. 3's behavior toward the female jurors even caused some of them to cry and fear for their safety. As the trial court aptly noted, a fair trial cannot "be had when the jurors in there are people afraid that someone's going to go off on them." Trial Trans. Vol. III (Mar. 9, 2015), p. 658.

{¶ 24} We also note that the record establishes that the complaints about Juror No. 3's behavior had nothing to do with his view of the case. Rather, the complaints resulted from Juror No. 3's attitude toward the female jurors and the discomfort and fear that he caused them. Juror No. 3 himself admitted that he was "ill-tempered" as a result of the female jurors' "stupid small talk" about their husbands and families, and due to their perceived attitudes towards him, i.e., disrespecting him, ignoring him, and finding him unattractive. Accordingly, it is abundantly clear from the record that Juror No. 3 was not replaced simply because he did not agree with the other jurors' views of the case.

{¶ 25} In addition, we find the record devoid of any evidence indicating that

Zaragoza was prejudiced by the alternate juror replacing Juror No. 3. Zaragoza contends that he was prejudiced because the composition of the jury changed. However, we fail to see how one can be prejudiced by the insertion of an alternate juror who was chosen by the parties at the inception of the case during voir dire. Zaragoza knew that if one of the twelve jurors had to be excused that the alternate would step in and become a part of the jury. Moreover, the alternate juror that replaced Juror No. 3 was present during the entire trial and confirmed that she had abided by the trial court's admonition to not discuss the proceedings with anyone until the jury reached a verdict. The alternate juror also indicated that she did not perform any outside research on the case and that she could perform her duties as a juror based solely upon the evidence presented at trial. Furthermore, after the trial court announced that the alternate juror would be replacing Juror No. 3, it properly instructed the jury to begin its deliberations anew as required by Crim.R. 24(G)(1).

**{¶ 26}** Zaragoza has also not demonstrated that the outcome of his trial would have been different had Juror No. 3 not been replaced. During his interview with the court, Juror No. 3 briefly stated that he was actually defending Zaragoza during deliberations; however, we do not find that this is sufficient to establish prejudice, as it is too speculative to conclude that Juror No. 3's continued presence on the jury panel would have resulted in the jury entering a verdict in Zaragoza's favor as opposed to becoming deadlocked.

**{¶ 27}** Zaragoza's First Assignment of Error is overruled.

**Second Assignment of Error**

{¶ 28} Zaragoza's Second Assignment of Error is as follows:

THE TRIAL COURT IMPROPERLY INTERVIEWED THE JUROR WITHOUT THE DEFENDANT OR COUNSEL PRESENT, DEPRIVING MR. ALVAREZ ZAR[A]GOZA OF THE RIGHT TO BE PRESENT DURING ALL PROCEEDINGS.

{¶ 29} Under his Second Assignment of Error, Zaragoza contends that the trial court erred in interviewing Juror No. 3 without counsel present.  Zaragoza also claims that the trial court had improper ex parte communications with the jury foreperson, and that the bailiff's ex parte conversations with the jurors, including the alternate juror, were improper as well.  We find no merit to Zaragoza's claims.

{¶ 30} All of the claims raised under Zaragoza's Second Assignment of Error are based on the Fourteenth Amendment due process right of a criminal defendant to be present at every critical stage of his trial.  *State v. Campbell*, 90 Ohio St.3d 320, 346, 738 N.E.2d 1178 (2000), citing *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934).  In implementing this right, Crim.R. 43(A) provides, in pertinent part: "[T]he defendant must be physically present at every stage of the criminal proceeding and trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules."  Therefore, "the defendant has the right to be present when the court communicates with the jury."  *State v. Mitchell*, 7th Dist. Columbiana No. 05 CO 63, 2008-Ohio-1525, ¶ 63, citing *State v. Abrams*, 39 Ohio St.2d 53, 55-56, 313 N.E.2d 823 (1974).

{¶ 31} "As a general rule, any communication with the jury outside the presence of the defendant or parties to a case by either the judge or court personnel is error which

may warrant the ordering of a new trial." (Citations omitted.) *State v. Schiebel*, 55 Ohio St.3d 71, 84, 564 N.E.2d 54 (1990). " 'Such communications are required to be made in the presence of the defendant or parties so that they may have an opportunity to be heard or to object before the judge's reply is made to the jury.' " *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 42, quoting *Bostic v. Conner*, 37 Ohio St.3d 144, 149, 524 N.E.2d 881 (1988).

{¶ 32} "The Supreme Court has made clear * * * that erroneous communications between the judge and jury constitute good cause for a new trial only if the communications prejudiced the defendant's right to a fair trial." (Citations omitted.) *State v. Manns,* 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657, ¶ 75 (2d Dist.). Accordingly, "there is not a conclusive presumption of prejudice." *Keiber v. Spicer Const. Co.*, 2d Dist. Greene Nos. 98CA23, 98CA30, 1999 WL 335140, *3 (May 28, 1999), citing *Schiebel* at 84. "To establish prejudice from such ex parte communications, 'the complaining party must first produce some evidence that a private contact, without full knowledge of the parties, occurred between the judge and jurors which involved substantive matters.' " *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 84, quoting *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph thirteen of the syllabus. "The complaining party must also show actual prejudice." (Citations omitted.) *Id.* Therefore, "[t]he communication must have been of a substantive nature and in some way prejudicial to the party complaining." *Schiebel* at 84.

{¶ 33} "A statement of the trial court or its official is not substantive if it does not address any legal issues, any fact in controversy, any law applicable to the case, or some

similar matter." (Citations omitted.) *State v. DiPietro*, 10th Dist. Franklin No. 09AP-202, 2009-Ohio-5854, ¶ 17. "[I]f the communication is not 'substantive,' the error is harmless." (Citations omitted.) *State v. Allen*, 73 Ohio St.3d 626, 630, 653 N.E.2d 675 (1995). "[E]ven where the communication involves a substantive issue, the defendant still must demonstrate that he was prejudiced by the communication." (Citation omitted.) *State v. Cook*, 10th Dist. Franklin No. 05AP-515, 2006-Ohio-3443, ¶ 36.

**{¶ 34}** Although couched as an ineffective assistance claim, in *State v. Floyd*, 2d Dist. Montgomery No. CA 6204, 1980 WL 352467 (Apr. 17, 1980), we addressed a situation similar to the case at bar. In *Floyd*, a juror reported to the bailiff that he had heard the defense counsel convey his personal opinion regarding the defendant's guilt. *Id*. at *6. In response, the trial court decided to interview the juror on the record without the presence of counsel. *Id*. After the interview, the trial court excused the juror and replaced him with an alternate. *Id*.

**{¶ 35}** On appeal, we reviewed the record of the interview and concluded that the appellant failed to demonstrate any prejudice resulting from the trial court conducting the interview of the juror without counsel being present. *Id*. at *7. We further found that any error in conducting the interview in such a manner was harmless, as there was nothing indicating that it precluded the defendant from receiving a fair trial. *Id*. *Compare United States v. Gay*, 522 F.2d 429, 435 (6th Cir.1975) (finding "the total absence of a record of the proceedings in which the changes in the makeup of the jury occurred requires us to assume prejudice").

**{¶ 36}** In this case, the trial court followed the same procedure as in *Floyd* in that it made a record of the ex parte interview it had with Juror No. 3. The trial court specifically

mentioned that the purpose for interviewing Juror No. 3 outside the presence of the parties and counsel was to prevent them from hearing where the jury was in its deliberations. We note that the Supreme Court of Ohio has stated that:

> Courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial. This undertaking is particularly sensitive where * * * the court endeavors to investigate allegations of juror misconduct during deliberations. As a general rule, no one—including the judge presiding at a trial—has a "right to know" how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror.

*Robb*, 88 Ohio St.3d at 81, 723 N.E.2d 1019.

{¶ 37} Regardless of the trial court's reasoning for interviewing Juror No. 3 in private, the record clearly establishes that the interview only concerned Juror No. 3's behavior. The trial court did not discuss any legal issues, fact in controversy, applicable law, or other similar matter with Juror No. 3. Therefore, the trial court's communication with Juror No. 3 was non-substantive, having nothing to do with the merits of Zaragoza's case. Because the communication was non-substantive, any error in conducting the interview in private was, at worst, harmless. *Allen,* 73 Ohio St.3d at 630, 653 N.E.2d 675.

{¶ 38} We also find that the trial court's ex parte communications with the jury foreperson amounted to, at worst, harmless error. The trial court advised counsel on the record about these communications and the record indicates that the communications were non-substantive in that they only concerned Juror No. 3's behavior. Furthermore,

the foreperson eventually discussed Juror No. 3's behavior on the record in the presence of both counsel, and thereafter, counsel had an opportunity to be heard and object before the judge made its decision regarding the removal of Juror No. 3. Accordingly, no prejudice resulted from the trial court's prior ex parte communications with the jury foreperson.

{¶ 39} The record also indicates that the bailiff's communication with the alternate juror was non-substantive, as it concerned the procedural matter of requesting the alternate juror's presence at court in the event Juror No. 3 was dismissed. *See, e.g., State v. Robinson*, 12th Dist. Fayette No. CA2005-11-029, 2007-Ohio-354, ¶ 41 (concluding bailiff's question to jurors regarding whether they intended to continue to deliberate or retire for the evening "was merely procedural and did not involve substantive issues of the case or in any way relate to appellant's guilt or innocence"). Moreover, the bailiff's other communications with the jurors about Juror No. 3 were merely a product of the jurors following the trial court's admonition to report and explain any personal issues to the bailiff. *See* Trial Trans. Vol. I (Mar. 2, 2015), p. 131. This is a standard admonition. *See Ohio Jury Instructions*, CR Section 205.03 (Rev. Aug. 15, 2012). Therefore, contrary to Zaragoza's claim otherwise, these communications were not inappropriate and were also non-substantive in that they only concerned Juror No. 3's behavior.

{¶ 40} Based on the foregoing, we conclude that all the communications at issue are non-substantive and that Zaragoza has failed to demonstrate that the communications prevented him from receiving a fair trial. In addition, the relief Zaragoza would be entitled to as a result of any improper communication would be a new trial,

which is already necessary in this case given that the jury could not reach a unanimous verdict and a mistrial was declared. Accordingly, any error in the communications at issue would be harmless.

{¶ 41} Zaragoza's Second Assignment of Error is overruled.

**Third Assignment of Error**

{¶ 42} Zaragoza's Third Assignment of Error is as follows:

SUBJECTING MR. ALVAREZ ZAR[A]GOZA TO A THIRD TRIAL VIOLATES HIS DOUBLE JEOPARDY PROTECTIONS.

{¶ 43} Under his Third Assignment of Error, Zaragoza argues that the trial court erred in overruling his motion to dismiss because trying him a third time after two mistrials would violate his constitutional rights under the Double Jeopardy Clause. We again disagree.

{¶ 44} The Double Jeopardy Clause ensures that a state may not put a defendant in jeopardy twice for the same offense. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). "The Double Jeopardy Clause only applies 'if there has been some event, such as an acquittal, which terminates original jeopardy.' " *State v. Griffin*, 2d Dist. Montgomery No. 21578, 2007-Ohio-2099, ¶ 10, quoting *Richardson v. United States*, 468 U.S. 317, 325, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984). It is well-established that a mistrial as a result of a deadlocked jury does not invoke double jeopardy implications because " 'a hung jury is not an event that terminates the original jeopardy to which [the defendant] was subjected.' " *Id.* "In other words, a hung jury is not the equivalent of an acquittal." *Id.* Therefore, "a retrial following a 'hung jury' does

not violate the Double Jeopardy Clause." *Richardson* at 324.

{¶ 45} Zaragoza, however, claims that "the unique hung jury situation" in this case caused jeopardy to attach after his second mistrial because he believes it was the trial court's error in replacing Juror No. 3 that caused the mistrial. In support of this contention, Zaragoza cites the Supreme Court of Ohio's holding in *State v. Gunnell*, 132 Ohio St.3d 442, 2012-Ohio-3236, 973 N.E.2d 243.

{¶ 46} In *Gunnell*, the Supreme Court considered whether a juror's outside research, i.e., a handwritten definition of the word "perverse" and an instruction on "involuntary manslaughter" that the juror had printed off the internet, constituted grounds for a mistrial. *Id.* at ¶ 9-10. After learning of the juror's possession of this information, the trial court conducted a brief hearing during which the court informed the parties of the issue that had developed regarding the juror's outside research and then proceeded to question the juror regarding her research, including what information she had found, why she had looked for it, and whether she had shared that information with any other jurors. *Id.* at ¶ 11. The trial court did not, however, question the juror to determine whether any prejudice or bias was created by the information or whether the juror could disregard it. *Id.* at ¶ 14, 32. Nevertheless, the trial court found that the juror was "irreparably tainted" and declared a mistrial. *Id.* at ¶ 34.

{¶ 47} The Supreme Court held that the trial court in *Gunnell* "did not soundly exercise [its] discretion" in declaring a mistrial because the trial court conducted a limited inquiry of the juror and failed to ascertain whether the materials viewed by the juror caused the juror to be biased or prejudiced against the defendant. *Id.* at ¶ 33-40. The Supreme Court further held that because the record did not "establish that a manifest

necessity existed to declare a mistrial, double jeopardy attaches, and the Constitution commands that no further prosecution of the appellee may occur." *Id.* at ¶ 40.

**{¶ 48}** Zaragoza cites *Gunnell* for the general proposition that a trial court's abuse of discretion in declaring a mistrial invokes double jeopardy and prevents retrial. However, in the present case, the trial court properly declared a mistrial based on the jury being unable to reach a unanimous verdict. A hung jury is the "prototypical example" of a situation where there is a manifest necessity for a mistrial. (Citations omitted.) *State ex rel. Bevins v. Cooper*, 138 Ohio St.3d 275, 2014-Ohio-544, 6 N.E.3d 33, ¶ 7. Accordingly, *Gunnell* simply does not apply to preclude Zaragoza from being retried for a third time.

**{¶ 49}** Furthermore, Zargoza's argument that jeopardy attaches because the second mistrial was caused by the trial court's failure to exercise sound discretion in replacing Juror No. 3 is based on a speculative chain of events, i.e., that Juror No. 3's replacement caused the jury deadlock which resulted in the second mistrial. Not only is there nothing in the record supporting such a claim, but we have already concluded under Zaragoza's First Assignment of Error that the trial court did not abuse its discretion in replacing Juror No. 3. Therefore, Zaragoza's argument otherwise lacks merit.

**{¶ 50}** Zaragoza's Third Assignment of Error is overruled.

### Conclusion

**{¶ 51}** Having overruled the three assignments of error raised by Zaragoza, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.




Copies mailed to:

Mathias H. Heck, Jr.
Michele D. Phipps
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Barbara P. Gorman