[Cite as *State v. Webster*, 2020-Ohio-3576.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-47 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-201 |
| | : | |
| ERIC WEBSTER, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of July, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, OH 45502
      Attorney for Plaintiff-Appellee

ADAM JAMES STOUT, Atty. Reg. No. 0080334, 5335 Far Hills Avenue, Suite 109, Dayton, Ohio 45429
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After his first jury trial ended in a mistrial due to a hung jury, a second jury found Eric Webster Jr. guilty of failure to comply with an order or signal of a police officer, a third-degree felony.   The trial court subsequently sentenced him to three years in prison and suspended his driver's license for ten years.

{¶ 2} Webster appeals from his conviction, claiming that his retrial violated his double jeopardy rights and his right to due process.   Webster further claims that his conviction was based on insufficient evidence and against the manifest weight of the evidence.   For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 3} On March 23, 2019, police officers observed Webster driving southbound on South Limestone Street in Springfield.   The officers recognized Webster and were aware that he did not have a valid driver's license.   When the officers turned on their overhead lights to initiate a traffic stop, Webster sped up.   The officers then turned on their siren, which Webster ignored.   Webster, driving 60 mph in a residential 25 mph area, ran multiple stop stops and nearly collided with another vehicle.   The officers ended their pursuit due to the risk of harm.

{¶ 4} On April 1, a grand jury indicted Webster for failure to comply with an order or signal of a police officer, with the allegation that his operation of a motor vehicle caused a substantial risk of serious physical harm to persons or property.   Officers arrested Webster on April 5.

{¶ 5} On Monday, June 10, 2019, the trial court conducted a one-day jury trial, during which Officers William Sanders and Tim Melvin testified for the State.   Webster

did not present any witnesses. He argued in defense, however, that he was not the driver of the vehicle.

{¶ 6} The jury began its deliberations around noon. At 12:48 p.m., the trial court provided a modified *Allen* charge[1] to the jury, apparently based on a representation that the jury was deadlocked. The jury resumed its deliberations. At 3:33 p.m., the jury returned to the courtroom, and the jury foreperson informed the court that there was no possibility of the jury's reaching a verdict with additional deliberation. The court discharged the jury, declared a mistrial based on a hung jury, and stated that court would reconvene the next morning with a new jury.

{¶ 7} A second jury trial commenced on Tuesday, June 11. Officers Sanders and Melvin again were the only witnesses. After deliberations, the jury found Webster guilty as charged. Three days later, after reviewing Webster's prior criminal record, the court orally imposed three years in prison. The court's written judgment also included a 10-year driver's license suspension.

{¶ 8} Webster appeals from his conviction, raising four assignments of error.

## II. Double Jeopardy and Due Process

{¶ 9} Webster's first and second assignments of error state:

> Double Jeopardy attaches when the Defendant was denied the ability to Move for Acquittal by scheduling the Second Trial the day after Defendant's first trial the ended in a mistrial.

---

[1] In *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L.Ed. 528 (1896), the U.S. Supreme Court set forth a summary of the supplemental instruction to be given by a trial court when jurors claimed they were deadlocked. *See also State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989); *State v. Mullins*, 2d Dist. Montgomery No. 27952, 2019-Ohio-812, ¶ 62.

Defendant was denied a right to due process when the Second Trial

was scheduled the next immediate day after the first mistrial.

We will address them together.

{¶ 10} In both assignments of error, Webster claims that the court's decision to schedule his retrial on the day following the mistrial deprived him of his constitutional rights. Webster states that the court provided no explanation for scheduling the retrial for the next day, and he was denied the opportunity to raise a Crim.R. 29(C) motion for a judgment of acquittal.

{¶ 11} The protections against double jeopardy provided in the Ohio and United States Constitutions are coextensive. *Clark v. Adult Parole Auth.*, 151 Ohio St.3d 522, 2017-Ohio-8391, 90 N.E.2d 909, ¶ 13, citing *State v. Gustafson*, 76 Ohio St.3d 425, 432, 668 N.E.2d 435 (1996). Under both Constitutions, the Double Jeopardy Clause protects against three abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *E.g., State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). None of these situations applies here.

{¶ 12} "It is well-established that a mistrial as a result of a deadlocked jury does not invoke double jeopardy implications." *State v. Zaragoza*, 2d Dist. Montgomery No. 26706, 2016-Ohio-144, ¶ 44. As we stated in *State v. Griffin*, 2d Dist. Montgomery No. 21578, 2007-Ohio-2099:

The Double Jeopardy Clause only applies "if there has been some event,

such as an acquittal, which terminates original jeopardy." *Richardson v. U.S.* (1984), 468 U.S. 317, 325, 104 S.Ct. 3081, 82 L.E.2d 242. "[A] trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree." *Id.*, at 326. In other words, a hung jury is not the equivalent of an acquittal. *Id.*, at 325.

*Id.* at ¶ 10.

{¶ 13} Webster does not challenge the trial court's decision to declare a mistrial due to a deadlocked jury. Stated differently, he does not claim that jeopardy attached because the court improperly declared a mistrial. He was not retried after a conviction or an acquittal, and this case does not involve multiple punishments for the same offense. Webster's challenge to the timing of his retrial implicates due process, not double jeopardy. Accordingly, Webster's first assignment of error is overruled.

{¶ 14} Webster claims that the trial court's scheduling of the retrial on the next day violated his due process rights because it deprived him of the opportunity to file a motion for a judgment of acquittal pursuant to Crim.R. 29(C). Crim.R. 29(C) provides:

**(C) Motion After Verdict or Discharge of Jury.** If a jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal *may be made or renewed within fourteen days* after the jury is discharged or within such further time as the court may fix during the fourteen day period. If a verdict of guilty is returned, the court may on

such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned, the court may enter judgment of acquittal. It shall not be a prerequisite to the making of such motion that a similar motion has been made prior to the submission of the case to the jury.

(Emphasis added.)

{¶ 15} The right to due process is fundamentally "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544, 38 N.E.2d 70 (1941). Due process is a "flexible concept and calls only for such procedural protection as a given situation demands." *Rice v. Islamic Ctr. of Peace, Inc.*, 2019-Ohio-3396, 142 N.E.3d 156, ¶ 9 (2d Dist.), citing *Mathews* at 334 and *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

{¶ 16} We recognize that, in certain civil contexts, courts have held that a trial court violates a party's right to due process when it rules on a motion without allowing the opposing party the opportunity to respond to the motion as provided by the Ohio or local rules of procedure. *See, e.g., Hillabrand v. Drypers Corp.*, 87 Ohio St.3d 517, 721 N.E.2d 1029 (2000) (the trial court erred in dismissing an action without allowing the non-moving party to respond, as allowed by procedural rules); *Ohio Bell Tel. Co. v. C-5 Constr., Inc.*, 2d Dist. Montgomery No. 23792, 2010-Ohio-4762, ¶ 25 ("A trial court errs in granting a motion prior to the expiration of the time allowed by Rules of Civil Procedure or the court's local rules for the non-moving party to respond."); *Bank One, N.A. v. Wesley*, 2d Dist. Montgomery No. 20259, 2004-Ohio-6051 (the court denied defendants their right to due

process when it ruled on a motion for default judgment before defendants' time to respond had expired).

{¶ 17} Although the trial court ordered Webster's retrial to occur the day after the mistrial, i.e., prior to the expiration of the time for filing a Crim.R. 29(C) motion, we find no due process violation in the circumstances before us. Webster did not object when the trial court stated that court would "reconvene tomorrow morning at 9:00 a.m. with a new jury," nor did Webster otherwise request that the trial court wait two weeks so that he could consider whether to file a Crim.R. 29(C) motion. Webster again did not object on June 11 prior to the beginning of the second trial. Webster was sentenced on June 14; he did not file a Crim.R. 29(C) motion prior to that date or request a continuance of the sentencing hearing so that such a motion could be filed.

{¶ 18} While the better course may have been for the trial court to schedule the second trial after the 14-day period had expired or to seek agreement of counsel as to the second trial date, Webster had an opportunity to object to the June 11 trial date, but did not. We cannot conclude that Webster's due process rights were violated when the June 11 retrial proceeded.

{¶ 19} Webster further claims that his due process rights were violated, because the State presented additional and contradictory evidence at the second trial. Webster states that the officers added that they were part of the Safety Task Force, they identified Webster by his street nickname, and they provided more information about how they knew Webster. Webster further indicates that, at the second trial, the officers provided different testimony as to the name of the owner of the vehicle that Webster allegedly was driving.

{¶ 20} Webster does not challenge the admissibility of the new evidence by the officers. His only complaint about the new details presented at the second trial is that they were not part of the officers' testimony at the first trial. However, the State was not required to present its case identically upon retrial. The State's decision to provide additional evidence at the second trial did not, without more, violate Webster's due process rights.

{¶ 21} Moreover, defense counsel was able to address any differences or inconsistencies in the witnesses' testimony between the first and second trials through cross-examination. Here, defense counsel elicited testimony that the officers had provided additional details at the second trial, and counsel argued in closing argument that certain details (e.g., how Webster was arrested several days later and Melvin's seeing the black Kia SUV at the gym) were not "part of the sworn testimony earlier in the case."

{¶ 22} We find no merit to Webster's claim that his due process rights were violated. Webster's second assignment of error is overruled.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 23} Webster's third and fourth assignments of error claim that his conviction was against the manifest weight of the evidence and based on insufficient evidence. Webster asserts that the State failed to present sufficient evidence that he was the driver of the vehicle. He further argues that the officers' testimony was not credible, particularly given the differences in their testimony between the first and second trials.

{¶ 24} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to

the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 25} In contrast, when reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact, but reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 26} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 27} In reviewing Webster's claims, we must consider only the evidence before the jury, which was the testimony of Officers Sanders and Melvin at the second trial on

June 11.

{¶ 28} According to the State's evidence at the second trial, on March 23, 2019, Officers Sanders and Melvin were patrol officers with the Springfield Police Department. Sanders testified that he previously worked for the Clark County Sheriff's Office. Melvin had two years of prior experience in other counties. As patrol officers, the officers performed traffic stops, took calls through dispatch, and investigated street-level crimes. For a while, both Melvin and Sanders were members of the Safety Task Force, which was brought together to combat street-level drugs crimes and violent crimes.

{¶ 29} Officer Sanders testified that he grew up in Clark County, went to school with Webster (who was a few years younger), and remembered Webster from school. Sanders had several encounters with Webster while Sanders worked for the Clark County Sheriff's Office. Officer Sanders knew from his time on the Safety Task Force that Webster went by the nickname "Smooth." Sanders identified Webster at trial.

{¶ 30} Officer Melvin testified that he first came into contact with Webster when he (Melvin) responded to a shooting of which Webster was the victim; Melvin stated that he tried to stop Webster's bleeding until medics arrived. Officer Melvin testified that he had seen Webster several other times in the community, specifically at high school basketball games at which Melvin worked and at a Planet Fitness gym that they both patronized. Melvin stated that he had seen Webster drive a black Kia SUV to and from the gym on multiple occasions, including two or three days before the incident at issue. Officer Melvin was familiar with how Webster styled his hair and the glasses he wore (gold rimmed frame with clear lenses). Officer Melvin knew that Webster had the nickname "Smooth." Melvin also identified Webster at trial.

{¶ 31} At 7:09 p.m. on March 23, 2019, Officers Sanders and Melvin were on uniformed patrol in a marked cruiser when they observed a black Kia SUV traveling southbound on South Limestone Street at approximately 35 mph (normal traffic). The officers were stopped at the stop sign at the intersection of South Limestone and East Liberty, facing westbound. It was still daylight, and traffic was light.

{¶ 32} Officer Sanders testified that he had gotten a good look at the driver. Officer Melvin testified that the driver was wearing a red shirt and gold rimmed glasses and his hair was styled with dreadlocks braided backwards, a style Melvin recognized for Webster. Both officers immediately recognized the driver as Webster and commented to each other that Webster was driving. From their past experience with Webster, both officers knew that Webster did not have a valid driver's license.

{¶ 33} Officer Melvin, who was driving the cruiser, turned onto South Limestone to follow the Kia. The officers followed Webster as he turned to go westbound on West Euclid, the street on which Webster lives. At some point, the officers ran the Kia's license plate; the vehicle was registered to a Springfield company. Officer Sanders testified that the vehicle was a rental.

{¶ 34} At the intersection with South Fountain, the officers activated the cruiser's overhead lights to initiate a traffic stop. Instead of stopping, however, Webster sped off on West Euclid. As Webster approached the busy intersection of West Euclid and South Center, the officers turned on their siren. Webster ran the stop sign at that intersection and several other stop signs further down West Euclid. Melvin testified that Webster's speed was approximately 60 mph. Sanders described the pursuit, stating:

So we continued westbound and following Mr. Webster also proceeding

westbound.   There was a car traveling northbound on Lowry.   The car had to stop in order to avoid hitting Mr. Webster.   At that point we stopped at the intersection.   His vehicle [the vehicle on Lowry] was stopped directly in the middle of the intersection.   Mr. Webster continued westbound and [at] that point there were vehicles parked on both sides of the road, so Mr. Webster actually went head on with a vehicle that was traveling eastbound as he was traveling westbound.

{¶ 35} The officers indicated that, at that point, they turned off the cruiser's lights and sirens and terminated the pursuit due to how fast Webster was driving, his almost causing an accident, and the presence of several people on the sidewalk.   Melvin explained: "[W]hen there's a pursuit and you know who the driver is, you already have charges on him, there's no reason to continue chasing somebody and somebody getting hurt, so you can terminate the pursuit and file the charges."

{¶ 36} Officer Melvin testified that, four or five days after the pursuit, he and Officer Sanders again encountered Webster.   Melvin stated that they were watching Webster's home and, at that time, they saw Webster leave the residence and drive away in a silver Dodge SUV owned by the same Springfield company as the Kia.   (Sanders testified that the officers did not see the Kia at Webster's residence after the pursuit.)   Officer Melvin advised other officers to initiate a traffic stop due to Webster's not having a valid license. That time, Webster stopped and did not flee.

{¶ 37} Defense counsel questioned the officers about their ability to identify Webster as the driver, given the time of day and the Kia's speed and distance from the officers.   Sanders testified that the sun was setting, but it was still daylight out.   Defense

counsel also elicited testimony from Officer Sanders that South Limestone Street had five lanes of traffic (two northbound, two southbound, and a turn lane), and that the Kia was in the curb lane on the far side of the street from the officers' stopped cruiser when it passed the intersection with East Liberty. Officer Sanders testified that the Kia was "approximately sixty feet away, so it wasn't too far." Sanders did not recall seeing the driver look toward the officers, but Sanders emphasized that both he and Melvin were "very familiar" with Webster and recognized him immediately.

{¶ 38} During Melvin's cross-examination, Melvin agreed that he had previously testified about this case. He acknowledged that his prior testimony did not discuss Melvin's seeing the black SUV at the gym, nor did Melvin previously testify about seeing Webster in the silver Dodge SUV. On further examination, Melvin acknowledged that the vehicle Webster drove several days after the pursuit "may have been a Mazda. I believe it was a Mazda 3, actually."

{¶ 39} Upon review of the evidence at trial, we cannot conclude that Webster's conviction was based on insufficient evidence or against the manifest weight of the evidence. Both officers testified that they were familiar with Webster from multiple past experiences and knew Webster on sight. Officer Melvin also had seen Webster driving a black Kia SUV just a few days before the March 23 incident. Both officers testified that Webster was the driver of the black Kia SUV on March 23, 2019. The State's evidence, if believed, was sufficient to prove that Webster was the driver of the black Kia.

{¶ 40} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It

was the province of the jury, as the trier of fact, to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Webster was the driver.

{¶ 41} In this case, defense counsel elicited testimony that the officers saw the black Kia SUV over four lanes of traffic, looking into the setting sun, while the vehicle was traveling approximately 35 miles per hour. Officer Melvin acknowledged that he may have been mistaken about the model of vehicle that Webster was driving on April 5, the day he was arrested. Although the jury reasonably could have questioned whether the officers accurately identified Webster as the driver, the jury also could have reasonably believed the testimony of the officers, who knew Webster from multiple prior encounters. Upon review of the evidence, we cannot conclude that the jury "lost its way" when it determined that Webster was the driver of the black Kia and that he failed to comply with an order or signal of a police officer.

{¶ 42} Webster's third and fourth assignments of error are overruled.

### IV. Conclusion

{¶ 43} The trial court's judgment will be affirmed.

. . . . . . . . . . . .


HALL, J. and WELBAUM, J., concur.


Copies sent to:

John M. Lintz
Adam James Stout
Hon. Douglas M. Rastatter