[Cite as *State v. Stargell*, 2022-Ohio-3847.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-57 |
| | : | |
| v. | : | Trial Court Case Nos. 2020-CR-655 & |
| | : | 2021-CR-230 |
| ROBERT STARGELL | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 28th day of October, 2022.

. . . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

JAMES S. SWEENEY, Atty. Reg. No. 0086402, 285 South Liberty Street, Powell, Ohio 43065
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Robert Stargell appeals his convictions for one count of failure to comply with the order or signal of a police officer and two counts of possession of drugs. Stargell filed a timely notice of appeal on November 9, 2021.

{¶ 2} The incident which resulted in the charged offenses occurred during the early morning hours of October 19, 2020, when Ohio State Trooper Robert Sabo was on patrol in Springfield, Ohio; Sabo observed an individual in a red Hyundai sedan traveling at approximately 49 miles per hour in a 35-mile-per-hour traffic zone. Trooper Sabo then initiated a traffic stop of the vehicle. After stopping the vehicle, Sabo exited his cruiser, made contact with the driver, explained the reason for the stop, and asked for his driver's license and proof of insurance. The driver, later identified as Stargell, provided his insurance card but was unable to provide a driver's license. Stargell verbally provided Trooper Sabo with a name and social security number, but they did not match. Trooper Sabo observed five individuals in the vehicle, including Stargell: two males, two females, and an individual whose gender Sabo was unable to identify.

{¶ 3} Trooper Sabo testified that he then walked back to his cruiser in order to check the information provided by Stargell. Before Sabo could sit down in his cruiser, Stargell sped away, driving westbound on State Route 40. Sabo immediately initiated pursuit of Stargell's vehicle, which reached speeds of up to 95 miles per hour. At some point during the chase, Stargell attempted to pull into a nearby neighborhood, but he ran off the road, drove through grass, and hit a stop sign. Stargell eventually regained control of the vehicle and drove back onto the street and into the neighborhood. Trooper Sabo observed Stargell turn the vehicle onto South Street. By the time Sabo caught up

with the vehicle, he observed it rolling into a cornfield with all the doors open; Sabo also observed that the two females who had originally been sitting in the rear of the vehicle were on their knees in the cornfield. Sabo drove his cruiser toward the vehicle, exited his cruiser, entered the moving vehicle, and brought it to a stop. No one else was in the vehicle when Sabo stopped it, and he was unable to locate the driver or the other two previous occupants.

{¶ 4} After securing the vehicle and the two females, Trooper Sabo performed an inventory search of the vehicle. Sabo testified that he discovered several bags of what appeared to be illegal drugs stuffed into the crevice of the driver's seat where the top and bottom sections met. The substances were later determined to be over 11 grams of cocaine and just over three grams of tramadol and fentanyl.

{¶ 5} While Trooper Sabo was still at the scene, at approximately 4:00 a.m., he observed a silver Chevy Impala occupied by two females in the front seats enter the neighborhood. Sabo testified that the appearance of the vehicle made him instantly suspicious, given the time and the events that had just transpired. Sabo also testified that it was cold, wet, and raining when the Impala appeared, and the occupants "were looking around like they were a little lost" and "like they were trying to figure out where they were, if they were pulling onto the right street." Suppression Tr., p. 16. Sabo observed the females drive into the neighborhood and drive back out only four to five minutes later. Other than the silver Impala, Sabo had observed no other vehicles entering or exiting the neighborhood except for a garbage truck. Sabo testified that he observed no signs or placards on the Impala indicating that it was a delivery or passenger

service vehicle. Sabo testified that he also confirmed with the two female passengers of the red Hyundai that the Impala was not the vehicle coming to retrieve them.

{¶ 6} Trooper Sabo testified that, based upon his observations, he had a reasonable suspicion that the two women in the Impala had arrived to help the missing occupants of the red Hyundai escape from the area. Sabo then initiated a stop of the Impala. When he asked the driver of the Impala to roll her window down, Sabo observed two males hiding in the back seat of the vehicle; Sabo removed the two males from the vehicle and identified them as the driver (Stargell) and the front-seat passenger of the red Hyundai. Stargell was arrested and taken into custody.

{¶ 7} On November 24, 2020, Stargell was indicted in Clark C.P. No. 2020-CR-655 for one count of failure to comply with the order or signal of a police officer, in violation of R.C. 2921.331(B) and (C)(5), a felony of the third degree. Stargell pled not guilty to the charged offense. On February 9, 2021, he filed a motion to suppress, arguing that the two traffic stops initiated by Trooper Sabo on the morning of October 19, 2020, had not been justified, and therefore any evidence recovered as a result of those stops should be suppressed. A hearing was held on March 4, 2021, and the trial court overruled Stargell's motion to suppress in its entirety on March 26, 2021.

{¶ 8} On April 13, 2021, Stargell was indicted in Clark C.P. No. 2021-CR-230 for two counts of possession of drugs in violation of R.C. 2925.11(A), arising out of Sabo's discovery of drugs in the vehicle as a result of the same incident; the offenses were third- and fourth-degree felonies. The two cases were consolidated for trial.

{¶ 9} Stargell was tried by a jury on June 30, 2021, and was found guilty on all

counts. The trial court sentenced him to three years in prison for failure to comply with the order or signal of a police officer; three years on the third-degree felony possession of drugs; and 18 months for the fourth-degree felony possession of drugs. The trial court ordered all the sentences to be served consecutively, for an aggregate term of 7.5 years in prison.

{¶ 10} Stargell appeals.

{¶ 11} We will begin with Stargell's second assignment of error:

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS.

{¶ 12} Stargell contends that the trial court erred when it overruled his motion to suppress. Specifically, Stargell argues that Trooper Sabo lacked a reasonable articulable suspicion to initiate a traffic stop of the silver Impala, where he was found hiding in the backseat.

{¶ 13} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

{¶ 14} "The Fourth Amendment to the United Stated Constitution prohibits unreasonable searches and seizures. Stopping an automobile constitutes a 'seizure.' " *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 16, citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "The United States Supreme Court has stated that a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7. This includes even minor traffic violations. *State v. Hardy*, 2d Dist. Montgomery No. 24114, 2011-Ohio-241, ¶ 20, citing *Mays* at ¶ 7-8. Furthermore, an officer's "reasonable suspicion may be based on behavior that is not illegal." *State v. Wortham*, 145 Ohio App.3d 126, 129, 761 N.E.2d 1151 (2d Dist.2001), citing *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

{¶ 15} " 'Reasonable, articulable suspicion' is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' " *State v. Fears*, 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930, ¶ 5, citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *State v. Scott*, 2d Dist. Clark No. 2013-CA-104, 2014-Ohio-4963, ¶ 12.

{¶ 16} In assessing an officer's conclusion that particular behavior should be investigated, "the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *State v. Andrews,* 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991), quoting *Terry v. Ohio*, 342 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Further, '[t]he

propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances.' " *Mays* at ¶ 7, quoting *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. "[T]hese circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Andrews* at 87-88.

{¶ 17} In support of his argument that Trooper Sabo lacked a reasonable articulable suspicion to initiate a traffic stop of the Impala, Stargell cites *State v. Carter*, 69 Ohio St.3d 57, 630 N.E.2d 355 (1994). The arresting officer in that case, while in an unmarked cruiser, observed a white Bronco at 10:15 a.m., and he testified that he "vaguely remembered" a police broadcast one or two weeks earlier about a Bronco's involvement in a shooting 20-25 blocks from his location. After briefly losing sight of the vehicle, the officer observed the Bronco parked behind the garage of a residence in a high crime area. As the officer surveilled the scene, he observed an individual carrying a bundle walk from a backyard and get into the passenger seat of the Bronco, which then pulled away. The officer testified that he suspected a breaking and entering had occurred. When asked what evidence supported that suspicion, he replied, "There was no evidence, counselor, of that happening. That just happened to be a procedural type of thing." The Supreme Court held that the facts available to the arresting officer at the moment of seizure "would not warrant a man of reasonable caution in the belief that the action taken by him was appropriate." *Id.* at 65.

{¶ 18} We find *Carter* to be distinguishable from Stargell's case. As previously stated, Trooper Sabo testified that he had observed a silver Impala with two female

occupants enter the neighborhood at approximately 4:00 a.m. and, under the circumstances, including the time of day and the events that had just transpired with the red Hyundai, he became instantly suspicious. Sabo also testified that it was cold, wet, and raining when the Impala appeared, and the female occupants looked "a little lost" and "like they were trying to figure out where they were." Suppression Tr., p. 16. Sabo also observed the women drive into the neighborhood and drive back out only four to five minutes later. Other than the Impala, Sabo had observed no other passenger vehicles enter or exit the neighborhood, and there was no indication via signs or placards that the Impala was a delivery or passenger service vehicle. Sabo also testified that he had confirmed with the two female passengers of the Hyundai that the Impala was not the vehicle coming to retrieve them. Based upon his observations, Sabo testified that he had a reasonable suspicion that the women in the Impala had arrived to help the missing occupants of the Hyundai escape from the area, and he therefore initiated a stop of the Impala.

{¶ 19} In light of the circumstances, viewed collectively, we agree with the trial court that Trooper Sabo articulated a sufficient basis for a reasonable suspicion that a crime was afoot when he initiated the investigatory stop of the Impala. The strict focus of the suppression hearing was on what was within Sabo's knowledge at the time of the stop. *See Dayton v. Erickson*, 76 Ohio St.3d 3, 6, 665 N.E.2d 1091 (1996) (the issue of whether an investigatory traffic stop is reasonable requires an "objective assessment of a police officer's actions in light of the facts and circumstances then known to the officer."). Here, the record establishes that Sabo had a reasonable articulable suspicion that the

women in the silver Impala were engaged in criminal activity, that is, they were attempting to help Stargell escape from the area after he abandoned the red Hyundai.

{¶ 20} Stargell's second assignment of error is overruled.

{¶ 21} Because we find it to be dispositive, we will next address Stargell's fifth assignment of error:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DISCHARGED JUROR NO. 7 AFTER DELIBERATIONS BEGAN.

{¶ 22} Stargell argues that the trial court abused its discretion when it discharged Juror No. 7 after jury deliberations had begun. Specifically, Stargell contends that the trial court was only permitted to remove Juror No. 7 if the court found that he was unable to perform his duties, which Stargell claims was not reflected in the record. Rather, Stargell claims that deliberations could have continued with Juror No. 7 on the jury panel and that the trial court's decision to replace him was an abuse of discretion.

{¶ 23} "Crim.R. 24(G) and R.C. 2945.29 address removal of jurors during criminal trials." *State v. Cunningham*, 2d Dist. Clark No. 2010-CA-57, 2012-Ohio-2794, ¶ 45. R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty[.]" Crim.R. 24(G)(1) similarly provides that alternate jurors "shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Moreover, "[a]s of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after deliberations have begun." *State v. Zaragoza*, 2d Dist. Montgomery No. 26706, 2016-Ohio-144, ¶ 18, quoting *State v. Hunt*, 10th Dist. Franklin

No. 12AP-103, 2013-Ohio-5326, ¶ 71. "However, '[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.' " *Id.*, quoting Crim.R. 24(G)(1).

**{¶ 24}** "A trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.' " *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 46, quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198, 500 N.E.2d 323 (11th Dist.1985). "Absent a record showing that the court abused that discretion which resulted in prejudice to the defense, the regularity of the proceedings is presumed." *Id.*, citing *Beach v. Sweeney*, 167 Ohio St. 477, 150 N.E.2d 42 (1958).

**{¶ 25}** "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

**{¶ 26}** In Stargell's case, jury deliberations began shortly after 5:00 p.m. on June 30, 2021. Approximately three hours later, at 8:18 p.m., the trial court received a note from Juror No. 7 which stated:

I [Juror No. 7] have presented my past involvement of drugs. Now the jury believes I'm using my personal life for my decision. They feel I should have disclosed my passed [sic] before now.

{¶ 27} Upon receiving the note, the trial court questioned Juror No. 7 in the presence of the prosecutor and defense counsel. Neither Stargell nor any of the other jurors was present while Juror No. 7 was questioned as follows:

The Court:     You can have a seat up here, sir, where you sat for trial.

Juror No. 7:   Okay.

The Court:     Is your client here?

Defense Counsel:   He is not, Your Honor. He lives so close so he drove to his home. I don't know exactly what the Court has planned, but I would waive his appearance for this.

The Court:     Okay. Yes. We are just going to question the juror as we talked about in chambers. We have [Juror No. 7]?

Juror No. 7:   Yes.

The Court:     Juror [No. 7] is present. Counsel for the State is present. Counsel for the defense is present. I have a note that is purportedly written by you. Did you write this note?

Juror No. 7:   Yes.

The Court:     And we talked about this in chambers a little bit. Can you tell us what your past involvement with drugs was?

Juror No. 7:   Yes. The, well, they were trying to figure out, you know, they

are all 100% --

The Court:    No, don't. I don't want to hear about the deliberations.

Juror No. 7:    Okay. I was explaining to them my knowledge when I was 21 years old.

The Court:    Okay. What is that knowledge?

Juror No. 7:    My knowledge of, how do I put it?   The whole cocaine-dealer life.

The Court:    Is that something you were involved in?

Juror No. 7:    Somewhat. I had that knowledge that I was sharing and they're like, wait a minute, we should have known about that.

Q [Court]:    Yeah. Well, that was my reaction.   Is there a reason you didn't disclose this when we were picking the jury?

A [Juror]:    I didn't, you know, that long ago, that was a different life. I was a different person. I've always just looked forward, and then I wanted to bring up my knowledge why I was saying what I was saying, well, this is the way it was.   And I don't know, with the evidence in front of me, I don't see how I could change my mind.

Q:    Well, I guess my concern is that I had instructed you, and all jurors, if there is anything that you could think of that could potentially call into question your ability to be fair and impartial, that you need to come forward with that and Juror No. 6. Well, I think she was excused.

The State:    She was.

The Court: There was a prospective Juror No. 6 that was talking about her sister who had some drug issues and we went into that in some depth. Did that not trigger any -

Juror No. 7: I never had any issues though. I just had knowledge. I never had issues.

Defense Counsel: If I could Judge. I think Juror No. 6 was talking about a conviction.

Juror No. 7: Yeah.

Defense Counsel: You are not talking about a conviction; am I correct?

Juror No. 7: Correct.

Defense Counsel: There's a little bit of a difference there.

The Court: Absolutely.

Defense Counsel: The way the questions were asked.

The Court: There's a difference there but we weren't so much talking about the conviction itself as we were talking about what effect that might have on that prospective juror and her being fair and impartial. I guess I just don't understand why you didn't disclose it. You're telling me that because it was so long ago that you just felt like it wouldn't affect you?

A: Like I said, again, it wasn't an issue of being a user. It was an issue of knowledge. They didn't understand my knowledge and why I guess -

Q: I just want to be clear. Are you saying you have firsthand knowledge of drug dealing?

A:     I have firsthand knowledge of cocaine runners.

Q:     Okay.

A:     Which are deceased. Years ago.

Q:     And what you are saying is that because this was so long ago you didn't think it was necessary to disclose this during jury selection.

A:     Because it would have no mental impact on my decision and they're thinking I'm taking it personal. I'm like, no, I'm seeing the evidence. And I'm just, it's like you ask a rocket engineer how do you get the booster to go. Well, he ain't gonna know if he don't have any knowledge. I just happen to be a little knowledgeable.

The Court:     Does the State have any questions for the juror?

The State:     No, Your Honor.

Defense Counsel:     If I'm hearing you correctly, [Juror No. 7], you're basing your current position, whatever that may be, and don't tell me, on the evidence you heard presented here today -

Juror No. 7:   The evidence.

Defense Counsel:     -- and basing it on both that evidence and the law that you received in the jury instructions?

A:     Correct.

Q:     And then you happen to have some background information that you happened to share, but that is not the basis of why you have the position that you currently have. Is that correct?

A:      Correct. I know they were all pretty uneasy. That's why I wrote the note.

The Court:     Well, I was reluctant to do this, but I need to get into it more specifically. Were you personally involved in dealing drugs?

Juror No. 7:   Not personally, no.

The Court:     So what is this knowledge that you have? Is it, was it friends? Acquaintances? How did you have this knowledge?

Juror No. 7:   It was the secrecy that I knew. The secrecy they got into talking about family, and I'm like, family or not, this stuff goes deeper.

Q:      Well, what was your involvement, if any, in the drug world? How did you get so close to it to have firsthand knowledge about it?

A:      Because it was my best friend in high school. His cousin was the dealer. And he disclosed a lot to me.

Q:      So he told you a lot of things about that lifestyle.

A:      And he showed me.

Q:      And showed you, but you yourself weren't involved?

A:      In the dealing?   No, sir.

Q:      What about using?

A:      I have once or twice but not - yes. That's not the knowledge I was giving. The knowledge was the proof on the table doesn't show me, me knowing how secret that world is, the knowledge shown in front of me doesn't prove what they are trying to prove on the premises of me knowing

how secret that society is.

Q:      So your position is based on knowledge that you have, not emotions because of something you were involved with or close to in the past.

A:      Correct.

Q:      It's not something that hits home emotionally and makes you less objective about the matter. It's not that. It's just that you have information, you have knowledge from past experiences that you're sharing with the other jurors and -

A:      Again, I'm not ignorant of what it feels like to take it.

Q:      Okay. All right. Any follow-up questions then?

The State:     No, Your Honor.

Defense Counsel:    No, Your Honor.

The Court:    All right. Okay. Thank you, [Juror No. 7]. You can go back in the jury room, and we are going to talk about how we are going to proceed here. Thank you. Appreciate it.

(Juror No. 7 exits courtroom.)

The Court:    All right. What I'm hearing him say -

The State:    Judge, I didn't want to say this in front of the jury because I didn't want to possibly taint, but we are not talking about drug dealing. There's no drug trafficking charges here.

The State:    Your Honor, he's not applying the evidence to the law that was read to him. He's trying to impose some kind of trafficking offense that is not

consistent with this case.

The State:[1]    The information about trafficking has not been brought up at all.

Defense Counsel:    I would disagree. I think I asked that question. Are you applying the facts to the law in this case? And he indicated that, yes, he was.

The State:    Yeah, but then he started talking about his knowledge of a drug trafficker, sharing his information of the secrecy of the life of drug trafficking. And so while I think he might be applying his knowledge that might be basing it on that, I don't understand the discussion of trafficking.

The Court:    I agree with you, but I think that's for the other jurors to say, look that's what you're telling us is inapplicable because we are dealing with possession not trafficking.

The State:    And that's why I didn't bring it up when he was in here.

The State:    And also, Your Honor, he admitted to using cocaine. Th[at] fact that would affect voir dire. He did not disclose that he had used cocaine. I went through the charges and everything with all the jurors in voir dire, especially stating possession of cocaine, not just possession of drugs.

Defense Counsel:    I don't think the question was ever asked, has anyone here ever used drugs, which could have elicited a response if that particular question was asked, perhaps then there'd be some obligation to do so.   I

---

[1] Two prosecutors were present for the State.   We have chosen not to use their names in recounting this exchange.

think we have a transcript of the record and that particular question was not asked.

The Court:    Well, I agree. I don't think that question was asked. But I know specifically I did ask for everybody to look at themselves from an objective standpoint, if there's anything that could call into question your ability to be fair and impartial. I suppose the question becomes, should have he disclosed that he used cocaine or been around people that used and/or trafficked in cocaine. I think if we were having this conversation while we were selecting the jury back in chambers, I would be very surprised if the State didn't use a peremptory challenge or at least a challenge for cause, so looking at it at that point of view.

Defense Counsel:    Judge, I would indicate that I know that voir dire is probably an hour and a half too, each and every juror has personal experiences that they bring to the table that we can't possibly know each and everything about them; and we give them a questionnaire that has about, quite frankly, when I go through them maybe three or four things I really actually care about and kinda highlight, if there's a yes or no on that particular question. But I think all of them with their own personal experiences, obviously he had something. I didn't look at the, I think I already turned in my questionnaires for privacy reasons, how old is he now? I think he's talking like a decade ago. But when we followed up with him, he was indicating pretty clearly based on the evidence in this case and the

facts as I'm interpreting them, and I think that's what we are called upon in the jury to do. I don't think we can Monday morning quarterback the situation because it's kinda odd to know anything related that's being talked about in deliberations, quite frankly. Usually that just kinda gets, I get that we get questions sometimes. Certainly, it's not the first time I ever had a question. This one is a little unique to delve into a little bit. I agree that you asked that question. He could have volunteered that. I think if we delve into all the jurors' past[s], if they had a -

The State: Well, to be fair, he said he had no problem recalling that and divulging it with the fellow jurors. It's not like it's something that he hasn't thought about. It's clear it's still there. And the State did pass on several peremptory challenges. The State would have challenged had we had this discussion with the juror during voir dire.

Defense Counsel: But we don't know the perimeters [sic] of the conversations that were had in deliberations. We literally know one thing that one juror has told us.

The State: That's true. What I'm saying is that he told them about his histories, something he's brought at least. We don't know how he brought it up. If he's described to us some of that information as has been described this morning, the State would have challenged this juror.

The State: The fact that he brought it up goes directly to the charges involved in this case. It's a key fact.

The Court: And the distinction between the conviction with the one prospective juror and his situation, that's a valid distinction, but you could argue that his, he's more closely connected to drugs because he himself used cocaine where that prospective juror was talking about her sister. It's hard for me to imagine how he could sit there and listen to a prospective juror talking about their sister that had used drugs and been convicted or been to court for it, that he wouldn't then say, well wait a second, I myself have used cocaine, perhaps I should disclose that. It just doesn't seem reasonable to me. But anyhow, I need to hear from both sides. What are you asking the Court to do?

The State: Your Honor, for the record, the State would move that Juror No. 7 be dismissed and that the alternate be seated.

The Court: On what basis?

The State: His failure to disclose the cocaine use during voir dire. Right now for that basis. He concealed the fact that he had personal knowledge of cocaine trafficking and that he used cocaine in the past. By your own question for them to be candid to bring up any information they may have felt was relevant. In addition to based on [sic] what we stated earlier and this doesn't sound like he's applying the facts in the law correctly in this case.

Defense Counsel: Why?

The State: Because he's applying trafficking to possession.

Defense Counsel: No. He was indicating he was looking at evidence and applying it to the law on the questions that I asked him. Does he have some prior history? Yes. How did that come up? We don't know. And Judge, though I agree that you asked that question, it's a very broad question, and a lot of jurors aren't going to naturally volunteer particular information that he may have known kinda the basis of the charges but we don't know a lot of the experiences of a lot of the jurors that happened ten years ago.

The Court: I agree with you. It's a pretty broad question, but I think that could cut against him. It was just a broad question and I told the jurors that nothing is too insignificant that how would that not have crossed his mind that he should have disclosed that.

The State: And I would also like to point out that Juror No. 6 brought that up on her own without being asked the question. That was something that-

The Court: But needless to say, your position is that the jurors should carry on. That there's been no, I guess, I don't know if juror misconduct would be the appropriate term, but that there is no basis to excuse this juror and replace him with the [alternate]. That's your position.

Defense Counsel: Absolutely. And I think based on the questions that I asked him applying the facts of the law to the evidence in this case, is that the basis and I said, correct, and he said yes. So could there have been, I don't know the guy's mens rea when we were talking to him at the beginning, I don't know what he was saying at that point. I can't say that.

Only he can say for certain why he did or did not answer the broad question. But the point is we now have about jury deliberations, and quite frankly, normally we wouldn't. And the fact that he's indicating is based on the facts and the question that I asked him. I don't know how to remove someone, the same that they are falling [sic] their duty as they're supposed to within it because something wasn't disclosed and we don't know how. We don't know if that was the basis of the question or I don't know how the jury in that conversation went. We are not supposed to know.

Trial Tr. p. 261-275.   At that point, the trial court took the matter under advisement and dismissed the jury for the evening.

{¶ 28} The following morning on July 1, 2021, Stargell's trial reconvened, and the trial court immediately dismissed Juror No. 7 and replaced him with the alternate.   The trial court then sent the jury back to continue deliberations.   Outside the hearing of the jury, the trial court explained it rationale for dismissing Juror No. 7 to the parties as follows:

> The Court:   The Court's instruction was clear. Juror No. 7 did not follow it. He withheld information that he knew, or should have known, was relevant to the selection process especially because another prospective juror had disclosed that her sister had past involvement with drugs, which prompted a significant amount of follow-up questioning. His quote "past involvement of drugs" clearly calls into question his ability to be fair and impartial.   In fact, the other eleven jurors question his ability to be fair and impartial as is evidenced by the content of Juror No. 7's note.

\* \* \*

So even eleven other jurors question his ability to be fair and impartial. I do find that the State was prejudiced by Juror No. 7's failure to disclose his past involvement with drugs. Counsel for the State indicated that they would have used a peremptory challenge on Juror No. 7 had they been aware of this newly discovered information and their position is corroborated by the fact that it did use a peremptory challenge on the aforementioned prospective juror whose sister had drug involvement.

\* \* \*

Because he didn't follow my instructions and the result of that is that the State was prejudiced. They didn't have a fair and impartial jury. They had a juror on there that purposely withheld information and you can make the argument that, oh, he just didn't know, he didn't think it was important.

Tr. 281-285.

{¶ 29} Because the discussion with Juror No. 6 during voir dire factored heavily into the trial court's calculus regarding its decision to dismiss Juror No. 7, we include it here.   After stating the elements of the offenses and asking if everyone understood them, the prosecutor continued:

The State:    Raise your hands if you guys have ever watched any kind of legal drama such as "Law and Order," "SVU," "Bluebloods," "Magnum P.I."

(Jurors respond affirmatively)

Juror No. 6:  My sister was actually convicted of drug trafficking.   She's

been with me now, six and a half years sober. I don't know if that matters to me being here.

Q: Okay.

A: And it was in this courtroom.

Q: Is there anything about that that may keep you from being a fair and impartial juror knowing what happened with your daughter?

A: My sister.

Q: Your sister.

A: I don't know. I will be honest, yes.

Q: Do you feel you may not be able to serve on this jury because of that?

A: Honestly, I don't know. This is my first time ever doing this. Under the circumstances, I don't want to take that chance honestly because I don't know. Sorry.

Q: That's perfectly fine. Thank you. * * *

 * * *

Defense Counsel:   [Juror No. 6], you had some concerns earlier, and I'm not trying to belabor the point. I just want to get clarification. Was it your aunt?

Juror No. 6:   Sister.

Q: I'm sorry, your sister. I think the prosecutor said daughter and I said aunt. Your sister. With regards to you having concerns that will make you,

you don't know if you will be able to fair and impartial.

A:      I think I could, but I'm a little nervous, honestly. They were very fair with my sister, and the verdict that was given to her. I just didn't know that would be something that would be a problem. It was in this courtroom, and it's all familiar faces from that, but they were very fair with her.

Q:      How recently was it?

A:      Oh, she's been with me now about six years. She's sober and lives with me. It's probably been seven or eight.

Q:      So I guess going back to my scales analogy, do you have concerns that this is making you more likely because you'll hear about drugs in this case to like prosecute or that you're like -

A:      I don't think it would make a difference. It was just the situation with my sister, and it just makes me nervous, I guess, you know. I'm sorry.   Just being honest.

Q:      No. I appreciate that. There are no wrong answers.

A:      I do believe that everybody needs to be innocent until proven guilty. I do believe that.

Q:      Sure. So you can follow the jury instructions. You can apply those to the facts of this case and make a determination based on only what you hear from that witness stand as well as physical evidence?

A:      Yes.

Q:      And the physical evidence is the exhibits and things that [the State]

talked about.

A:      Yes.

Q:      And obviously, the answers that would come up there.

A:      Yes.

Q:      And base it solely on that and not on anything that happened prior with your sister.

A:      Yes. I think the Court was very fair with her. She was convicted and they were very fair. Yes, I can be fair. Yes.

Tr. 22-23; 45-47.

{¶ 30} In our view, the circumstances involved regarding the answers provided by Juror No. 6 and Juror No. 7 were factually distinguishable.   Juror No. 6 was concerned that her sister's drug conviction could affect the way she viewed the evidence adduced at trial.   Although Juror No. 6 eventually stated that she could view the evidence in a fair and impartial manner, she initially had indicated that she was not sure that she could. Conversely, Juror No. 7 never wavered when asked if he could remain fair and impartial, stating several times that he could.   Furthermore, merely having knowledge of the drug trade through a friend in high school is an entirely different situation than witnessing your own sibling be convicted and sentenced for a crime involving illegal drugs.   Thus, the trial court's reliance on the information provided by Juror No. 6 as a basis for dismissing Juror No. 7 was erroneous.    Notably, the State moved to dismiss Juror No. 6 using a challenge for cause, which the trial court denied; however, the State later used a peremptory challenge to have her dismissed from the jury.

{¶ 31} In *State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008-Ohio-2041, the court held that a trial court did not abuse its discretion in replacing a juror with an alternate where the original juror was observed laughing inappropriately, exhibiting odd behaviors, and was not forthcoming as to her true address. *Id.* at ¶ 66. Other jurisdictions have found the removal of a juror permissible when the juror threatens or intimidates other jurors and disrupts deliberations. *See Shotikare v. United States*, 779 A.2d 335, 340 (D.C.2001). For instance, in *State v. Arnold*, 280 Ga. 487, 629 S.E.2d 807 (2006), it was held that a trial court did not abuse its discretion in removing a juror who cursed at other jurors and actively humiliated them through the use of vindictive personal attacks such as calling them "stupid" and "monkeys". *Id.* at 490. Nevertheless, a juror cannot be removed if there is " 'any possibility' that fellow jurors' complaints about him or her are rooted in his or her view of the merits of the case." *State v. Robb*, 88 Ohio St.3d 59, 81, 723 N.E.2d 1019 (2000), quoting *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir.1997).

{¶ 32} In *Zaragoza*, 2d Dist. Montgomery No. 26706, 2016-Ohio-144, there were allegations that a trial court had abused its discretion in replacing a juror during the defendant's second trial and that the trial court had improperly interviewed the dismissed juror outside the presence of counsel. Further, one of the jurors had become agitated during the first day of deliberations, there were complaints to the court's bailiff that the juror had been verbally abusive to other jury members, and the bailiff had observed four of the jurors crying, including the foreperson. *Id.* at ¶ 4. The court stated its intent to interview the juror on the record, without counsel present, before determining whether to

remove the juror from the jury. *Id.* at ¶ 9. Defense counsel objected to the interview without counsel present and to the removal of the juror from the jury. *Id.* The court proceeded with a private interview of the juror over defense counsel's objection. *Id.*

**{¶ 33}** Following the interview, the trial court dismissed the juror, concluding that he was unstable, disruptive of deliberations, and a safety threat to the female jurors. *Id.* at ¶ 11. The court interviewed the alternate juror in the presence of counsel and replaced the disruptive juror with the alternate, noting defense counsel's continuing objection. *Id.* The jury restarted deliberations and later sent a note to the court that it could not reach a unanimous verdict. *Id.* at ¶ 12-13. The trial court requested whether, if given more time, it was possible to reach an agreement, to which the jury responded it could not. *Id.* at ¶ 13. As such, the court declared a mistrial. *Id.* at ¶ 13.

**{¶ 34}** Zaragoza argued on appeal that the trial court's decision to replace the juror had prejudiced him. *Id.* at ¶ 17. The appellate court disagreed, finding that the trial court had not abused its discretion in removing the juror from the jury. *Id.* at ¶ 23. The appellate court found that the defendant had not demonstrated that the outcome of his trial would have been different had the juror not been replaced. *Id.* at ¶ 26. The court further found no merit in Zaragoza's argument that the trial court had improperly interviewed the juror without him or his counsel present, thereby depriving him of the right to be present during all proceedings. *Id.* at ¶ 29. We find *Zaragoza* to be clearly distinguishable from Stargell's case.

**{¶ 35}** We emphasize that R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason

is unable to perform his duty[.]" Crim.R. 24(G)(1) further provides that alternate jurors "shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties" and that, "[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." In *Zaragoza*, the dismissed juror was found to be unstable, disruptive, and a safety threat to the female jurors. Simply put, the dismissed juror was unable to perform his duties based upon his unruly behavior. Unlike the situation present in *Zaragoza*, Juror No. 7 never acted in a disruptive or unruly manner. In fact, the record establishes that Juror No. 7 performed his duties in an able and thoughtful fashion throughout the course of the proceedings.

{¶ 36} On this record, we find that the trial court abused its discretion when it dismissed Juror No. 7 after deliberations began. The record establishes that, when questioned by counsel during voir dire and later by the trial court, Juror No. 7 gave no indication that he was unable or unwilling to perform his duty as a juror in Stargell's trial. Specifically, when asked during voir dire if there was anything that would keep him from being a good juror in the case, Juror No. 7's response was "nope." Tr. 31-32. Juror No. 7 also stated during voir dire that he was "a good listener, and I like taking in two sides of a story instead of one side." Tr. 32.

{¶ 37} When questioned by the trial court after the note was received regarding why he failed to disclose his knowledge of cocaine trafficking, Juror No. 7 stated that "it would have no mental impact on my decision and they're thinking I'm taking it personal. I'm like, no, I'm seeing the evidence." *Id.* at 265. Furthermore, when questioned by

defense counsel about what he was basing his position on during deliberations, Juror No. 7 unequivocally stated that his position on Stargell's guilt or innocence was based upon "the evidence" and "the jury instructions" provided by the trial court. Again, the record gives no indication that Juror No. 7 was either unable or unwilling to continue serving as a juror in Stargell's trial; rather, Juror No. 7 was perfectly willing and able to continue with deliberations.

**{¶ 38}** In our view, the trial court abused its discretion when it dismissed Juror No. 7 after deliberations began. There is no indication in the record before us that Juror No. 7 was unable to continue serving as a juror, and there is no evidence that Juror No. 7 willfully withheld information that would have served to disqualify him from further deliberations.

**{¶ 39}** Stargell's fifth assignment of error is sustained.

**{¶ 40}** Stargell's remaining assignments of error (I, III, and IV) are as follows:

THE TRIAL COURT ERRED WHEN IT ENTERED A JUDGMENT AGAINST THE APPELLANT WHEN THE JUDGMENT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REQUIRED A DEFENSE WITNESS TO APPEAR IN HANDCUFFS BEFORE THE JURY.

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED TROOPER SABO TO RENDER OPINION TESTIMONY.

**{¶ 41}** In light of our disposition of Stargell's fifth assignment of error, assignments

of error one, three, and four are moot, and we need not discuss their merits.

{¶ 42} Stargell's fifth assignment of error having been sustained, the trial court's judgments of conviction are reversed, and this matter is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

LEWIS, J. and WELBAUM, J., concur.

Copies sent to:

Ian A. Richardson
James S. Sweeney
Hon. Douglas M. Rastatter